## 2022 CA 003151 B PARHAM, EVELYN et al Vs. DISTRICT OF COLUMBIA et al HMP

- Case Type:
- Civil II
- Case Status:
- Open
- File Date:
- 07/20/2022
- Action:
- Complaint for Declaratory Judgment Filed
- Status Date:
- 07/20/2022
- Next Event:
- 10/28/2022

| All Information | Party | Event | Docket | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 07/20/2022 | Complaint for Declaratory Judgment Filed  Receipt: 497130  Date: 07/21/2022 | |
| 07/20/2022 | eComplaint Filed.  submitted 07/20/2022 13:10. mw<br>Attorney: DICKSON, ANDREW B (1618684)<br>EVELYN PARHAM (Plaintiff); NICHOLE JONES (Plaintiff); CARLOTTA MITCHELL (Plaintiff); DOMINIQUE ROBERTS (Plaintiff); VICTOR HALL (Plaintiff); | Image |
| 07/21/2022 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 10/28/2022    Time: 9:30 am<br>Judge: PASICHOW, HEIDI M    Location: Courtroom 516 | |
| 07/21/2022 | Plaintiffs' UnOpposed Motion For Enlargement Of Page Limits For Plaintiffs' Memorandum Of Points And Authorities In Support Of Their Motion For Preliminary Injunction Filed. submitted 07/21/2022 17:43. NB<br>Attorney: DICKSON, ANDREW B (1618684)<br>EVELYN PARHAM (Plaintiff);  Receipt: 497356  Date: 07/22/2022 | Image |
| 07/21/2022 | Additional eFiling Document to Plaintiffs' UnOpposed Motion For Enlargement Of Page Limits For Plaintiffs' Memorandum Of Points And Authorities In Support Of Their Motion For Preliminary Injunction Filed. submitted 07/21/2022 17:43. NB<br>Attorney: DICKSON, ANDREW B (1618684)<br>EVELYN PARHAM (Plaintiff); | Image |
| 07/26/2022 | Complaint Package eServed to Filer | Image |

Filed
D.C. Superior Court
07/26/2022 13:30PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **EVELYN PARHAM**<br>3723 D St. SE, Apt. 101<br>Washington, D.C. 20019<br><br>**NICHOLE JONES**<br>1910 Massachusetts Ave. SE<br>Washington, D.C. 20036<br><br>**CARLOTTA MITCHELL**<br>4600 Martin Luther King Jr. Ave SW, Apt.<br>C512<br>Washington, D.C. 20032<br><br>**DOMINIQUE ROBERTS**<br>1200 G St. NE<br>Washington, D.C. 20002<br><br>and<br><br>**VICTOR HALL**<br>1224 Canal St. SW<br>Washington, D.C. 20024<br><br>*Plaintiffs,*<br>v.<br>**DISTRICT OF COLUMBIA**<br><br>**GABRIEL ROBINSON**, Director of the<br>District of Columbia Department of Motor<br>Vehicles, in his official capacity<br><br>and<br><br>**GLEN LEE**, Chief Financial Officer for the<br>District of Columbia, in his official capacity<br><br>*Defendants.* | **Case No.:**  2022 CA 003151 B |

1

## COMPLAINT

Plaintiffs Evelyn Parham, Nichole Jones, Carlotta Mitchell, Dominique Roberts, and Victor Hall bring this complaint against Defendants District of Columbia, Gabriel Robinson, and Glen Lee, and allege as follows:

## INTRODUCTION

1.      For more than two decades, the District of Columbia ("the District" or "DC") has operated a wealth-based driver's license scheme that perpetuates the poverty of its poorest residents. The District enforces this scheme under what is known as the "Clean Hands Law," D.C. Code § 47-2861, *et seq.* That law disqualifies Plaintiffs and thousands of DC residents in poverty from obtaining or renewing a driver's license as punishment for owing the District more than $100 in parking, traffic, or other fines or fees. Disqualification is automatic: in disallowing Plaintiffs and others who owe more than $100 from obtaining or renewing a driver's license, the Clean Hands Law provides for no inquiry into the drivers' ability to pay and requires no determination that the failure to pay is willful.

2.      For DC residents who can afford to pay their parking and traffic tickets, the Clean Hands Law is inconsequential. These residents typically enter a credit card account number into an online payment portal established by the District, obtain a receipt of payment, and then move on with their lives.

3.      For DC residents who cannot afford to pay their parking and traffic tickets, the impact of the Clean Hands Law is severe and often life-altering. Without a driver's license, Plaintiffs and other DC residents of limited means struggle with essential daily activities, including purchasing food at the grocery store, attending medical appointments, transporting children to childcare, visiting and caring for elderly relatives, and finding and keeping employment. The Clean

Hands Law not only punishes DC residents for their poverty, but intensifies the instability of their everyday lives.

4.     The Clean Hands Law also exacts substantial societal costs. Because the harms inflicted by the Clean Hands Law fall disproportionately on Black DC residents, the law exacerbates racial inequalities. The Clean Hands Law also disrupts the workforce, harming both workers and employers. It needlessly exposes individuals to criminal punishment, again with a disproportionate impact on Black DC residents. And it diverts finite public safety resources from addressing violent crime.

5.     Even with all the damage it does, the Clean Hands Law does not achieve its intended purpose of compelling people to pay their debts to generate revenue for the District. The vast majority of unpaid parking and traffic fines—about 85%—are owed by non-DC residents, most from Virginia and Maryland. The threat of non-renewal of a DC driver's license under the Clean Hands Law does not affect them. This threat also has no coercive effect on DC residents who can afford to pay their parking and traffic fines, as they have numerous other reasons to do so. Nor is the threat effective against DC residents who are too poor to pay. These residents cannot come up with money they simply do not have. Indeed, for Plaintiffs and other DC residents of limited means, enforcement of the Clean Hands Law *undermines* the District's payment-coercion objective: by automatically disqualifying these residents from driving, the statute makes it harder for them to find or keep a job and thus diminishes the likelihood they will be able to pay their debts.

6.     The District's enforcement of the Clean Hands Law violates Plaintiffs' rights under Fifth Amendment to the Constitution in four ways. *First*, it violates procedural due process by providing Plaintiffs no hearing at all prior to (or after) depriving them of their constitutionally

protected property interest in a driver's license. *Second*, enforcement of the Clean Hands Law violates the Fifth Amendment at the "convergence" of its due process and equal protection guarantees by depriving Plaintiffs of their driver's licenses without any inquiry into their ability to pay fines and fees and, thus, without any determination that the failure to pay is willful rather than a consequence of their poverty. *Third*, enforcement of the Clean Hands Law violates equal protection guarantees because it disqualifies Plaintiffs from obtaining or renewing a driver's license as a penalty for owing money to the District, while District law does not impose an equally harsh penalty on DC residents unable to satisfy civil money judgments to private parties. *Fourth*, enforcement of the Clean Hands Law violates substantive due process because depriving Plaintiffs of the ability to obtain or renew a driver's license based on the nonpayment of parking and traffic debts does not achieve, cannot plausibly achieve, and thus is not rationally related to the statute's objective of coercing them to pay their debts to generate revenue for the District.

7.      Because the District's enforcement of the Clean Hands Law violates these Fifth Amendment guarantees, Plaintiffs are entitled to both declaratory relief and an injunction barring enforcement of the law against them.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under D.C. Code § 11-921(a) and 42 U.S.C. § 1983.

9.      Venue is proper in this Court because all parties reside in the District and because all wrongful conduct giving rise to this case occurred in, was directed to, or emanated from the District.

## PARTIES

10.     **Plaintiff Evelyn Parham** is a 51 year-old Black Ward 7 District resident who has been automatically disqualified from renewing a DC driver's license because of unpaid parking and traffic tickets and related fines and fees that, income permitting, she would pay but is currently unable to afford to pay.

11.     On December 20, 2016, Ms. Parham was in a car accident in Northeast DC after she drove over a pothole on the Benning Road Bridge. All of her tickets stem from this accident.

12.     On the day of the accident, Ms. Parham had to pay for her car to be towed. The very next day, December 21, she contacted the District's 311 number and requested compensation for the damage to her car. Ms. Parham was given a claim number and told that a reimbursement form would be sent to her in the mail. The delivery of that form, however, was severely delayed. Ms. Parham had to call the District's Office of Risk Management on three separate occasions in January and February 2017 to obtain it.

13.     Ms. Parham finally received the required reimbursement form in February 2017, nearly two months after her accident. Because of heavy snow that winter, Ms. Parham had trouble getting a mechanic to inspect and photograph her car, as required by the form. When Ms. Parham submitted a completed form in mid-June 2017, the District government informed her that it would not pay for the damage to her car because she had waited too long to submit the form. Ms. Parham later learned that under DC law, she had to submit her claim by June 18, 2017, and that the District rejected her reimbursement request because it was submitted three days late.

14.     Given the damage to Ms. Parham's car from the accident and Ms. Parham's inability to pay for towing, the car continued to sit idle outside of her home. Ms. Parham's car's inspection certificate expired on June 3, 2017. Her registration expired on June 4, 2017. Worried that her car would be ticketed, Ms. Parham contacted staff at the Office of the Mayor. Staff

informed her that her case would be noted, and her car would not be ticketed. Despite this, Ms. Parham's car was ticketed for expired tags and inspection as it sat outside of her house. The following month, July 2017, Ms. Parham's car was ticketed twice more. Ms. Parham was given assurances by the Metropolitan Police Department that her car would not be further ticketed and that it would not be towed. However, in November 2017, Ms. Parham's car was towed.

15.     Ms. Parham appealed these tickets, and the fact that her car was towed, to the Department of Motor Vehicles ("DMV") Adjudication Services Office. Her appeals were rejected.

16.     On April 22, 2019, Ms. Parham's driver's license expired. Under the Clean Hands Law, she is automatically disqualified from renewing it due to her outstanding debt of over $100 to the District.

17.     The DMV has informed Ms. Parham that she cannot renew her driver's license until she pays $800 in outstanding debt, as well as a $120 reinstatement fee and a $44 license registration fee.

18.     Ms. Parham can no longer work, and so does not have employment income. She currently receives $771 a month in SSI assistance and $238 a month in food stamp benefits. After paying for the necessities of daily living, she does not have enough money left to pay her outstanding fines and fees.

19.     Not having a license makes it more difficult for Ms. Parham to care for her elderly mother, who is disabled and lives with her. Because Ms. Parham cannot drive, she must spend precious funds to pay for others to pick up her mother and transport her to her medical appointments. Additionally, Ms. Parham must seek transportation to run her personal errands, including picking up her own medications.

20.     **Plaintiff Nichole Jones** is a 48 year-old Black Ward 8 District resident who has been automatically disqualified from renewing a DC driver's license because of unpaid parking and traffic tickets and related fines and fees that, income permitting, she would pay but is currently unable to afford to pay.

21.     Ms. Jones currently lives at the Harriet Tubman Women's Shelter in Southeast DC.

22.     Ms. Jones is a graduate from the University of the District of Columbia. She previously had a career in public service.

23.     In 2008, Ms. Jones was seriously injured. Since then, she has been unable to work, and her financial situation, already stressed from student loans, deteriorated further.

24.     Over time, Ms. Jones accumulated $2,884 in tickets. Initially, she had tickets for parking and minor moving violations. When these tickets remained unpaid, her license was suspended without her knowledge. In 2014, Ms. Jones was arrested and received additional tickets for driving on a suspended license. Ms. Jones later incurred additional fines when two checks she wrote to pay off her debt bounced due to insufficient funds.

25.     Ms. Jones presently has no income and receives no government assistance. She cannot afford to pay her outstanding debt to the District and thus cannot renew her driver's license.

26.     Without a driver's license, Ms. Jones must walk to get from place to place to the extent she can. She now has limited mobility because she has developed a muscular cyst on her left foot as a result of constant walking.

27.     With a driver's license, Ms. Jones could earn income driving for a rideshare service like Lyft or Uber. She could also pursue resuming work in an office job. Without a license, neither is possible.

28.     **Plaintiff Carlotta Mitchell** is a 70 year-old Black Ward 8 District resident who has been automatically disqualified from renewing a DC driver's license because of unpaid parking tickets and related fines and fees that, income permitting, she would pay but is currently unable to afford to pay.

29.     Ms. Mitchell is a college graduate who has worked as an elementary school teacher, a civil servant, and a business consultant.

30.     In 2009, Ms. Mitchell became unemployed and eventually became homeless. She stayed periodically at the John L. Young Women's Shelter, the Nativity Shelter for Women, and the Open Door Shelter. Often, however, Ms. Mitchell slept in her car with her therapy dog. During this period, Ms. Mitchell's car's registration expired, and she could not afford to renew it.

31.     As a result of parking tickets accumulated between 2012 and 2014, Ms. Mitchell owes $660 in debt to the District. All of her parking tickets arose from the expiration of her vehicle's tags during her period of homelessness and residence in shelters. None of her outstanding tickets are for speeding or other moving violations.

32.     Ms. Mitchell remains unemployed. She has no pension. She currently receives $970 per month in Social Security, $40 a month in DC's Low Income Home Energy Assistance Program, and $200 a month in food stamps benefits, a sum which will be reduced when pandemic relief expires. Ms. Mitchell uses this money to feed and clothe herself and pay for other necessities. She does not have disposable income to pay off her outstanding parking fines and fees so that she can renew her driver's license.

33.     There are few grocery stores in Ms. Mitchell's neighborhood. Without a driver's license, Ms. Mitchell must rely on taxis, rideshare companies and, when feasible, Metro services, to shop for food.

34.    **Plaintiff Dominique Roberts** is a 35 year-old Black Ward 6 District resident who has been automatically disqualified from obtaining a DC driver's license because of unpaid parking and traffic tickets and related fines and fees that, income permitting, she would promptly pay, but that she is unable to afford to pay.

35.    Ms. Roberts works as a nurse in the Intensive Care Unit at Washington Hospital Center.

36.    Currently, Ms. Roberts owes the District $1,200 in fines and fees. This debt stems from four tickets: two for parking and two for minor moving violations where Ms. Roberts was driving between eleven and twenty miles over the speed limit.

37.    Ms. Roberts' driver's license expired in September 2019. Because of her outstanding debt to the District, the Clean Hands Law has prevented her from renewing her license.

38.    Although she is currently paying off her debt little by little, Ms. Roberts cannot do so all at once, and so remains barred from obtaining a new driver's license. She is gainfully employed, but she is raising three school-age daughters and cares for her aging mother, who lives with them. Ms. Roberts receives no child support to aid her in raising her children.

39.    Without the ability to drive, Ms. Roberts struggles to raise her three daughters and care for her mother. Her youngest child is unable to participate in many extracurricular activities because Ms. Roberts cannot drive her.

40.    The renewal of a nursing license, like the renewal of other professional licenses and driver's licenses, is subject to the Clean Hands Law. While Ms. Roberts presently has a nursing license, she is concerned that, if left unpaid, her outstanding fines and fees will disqualify her from renewing that license when it expires in June 2023, and she will lose her job as a result.

41.    **Plaintiff Victor Hall** is a 59 year-old Black Ward 6 DC resident who has been automatically disqualified from obtaining a DC driver's license because of unpaid parking and traffic tickets and related fines and fees that, income permitting, he would promptly pay, but is unable to afford to pay.

42.    Mr. Hall was born and raised in the District.

43.    For 14 years, Mr. Hall served both as a reservist with the D.C. National Guard and in active duty as a sergeant with the Army.

44.    Mr. Hall has a certificate in heating, ventilation and air conditioning (HVAC) maintenance, and did HVAC maintenance and repair work in the DC metropolitan area for many years.

45.    In April 2020, Mr. Hall was working at a local heating and air conditioning company. That month, he was seriously injured and has not worked since.

46.    Mr. Hall receives regular physical therapy for his injuries at the VA Hospital and Washington Hospital Center. He currently has no income and no unemployment insurance.

47.    According to the District of Columbia, Mr. Hall currently has over $2,000 in unpaid fines and fees for tickets issued between 2010 and 2012. Two of these tickets are for parking violations. One is for driving through a red light. The other two are speed camera tickets that were issued when his vehicle was being driven by someone else.

48.    In 2021, Mr. Hall received a letter from a collection agency representing the District that offered to resolve his debt for $999. At that time, Mr. Hall was unable to pay this amount and remains unable to pay this amount.

49.    Mr. Hall faces daily hardships because, due to the Clean Hands Law, he cannot legally drive. He must rely on friends or expensive rideshare services for rides to his medical and

physical therapy appointments, each of which he has twice a week, and to visit family members. Despite being unable to drive lawfully, Mr. Hall is prepared to drive his car to fulfill the necessities of daily life when he cannot get a ride.

50.     If Mr. Hall had a driver's license, he would be far more capable of visiting family, attending his appointments consistently, and looking for a job.

51.     **Defendant District of Columbia** is a municipal corporation that may be sued under D.C. Code § 1-102 for the acts and omissions of its agents, including agencies such as the Department of Motor Vehicles ("DMV") and the Office of the Chief Financial Officer ("OCFO"). Through the DMV and OCFO, the District enforces the Clean Hands Law.

52.     **Defendant Gabriel Robinson** is the Director of the DMV. Director Robinson is sued in his official capacity. At all times relevant to the events, acts, or omissions alleged in this Complaint, Director Robinson has acted pursuant to his authority as an official of the District. As Director of the DMV, Defendant Robinson oversees the issuance, renewal, suspension, and revocation of driver's licenses. Under Defendant Robinson, the DMV enforces the Clean Hands Law as follows: (1) when a DC resident applies to the DMV to obtain or renew a driver's license, the DMV automatically cross-checks electronically stored records from OCFO to determine if the individual owes more than $100 in fines or fees to the District; and (2) if OCFO's records indicate the individual owes more than $100, the DMV automatically rejects the individual's application without inquiring into the individual's ability to pay the outstanding debt and without determining that the failure to pay is willful and not a consequence of the individual's poverty.

53.     **Defendant Glen Lee** is the Chief Financial Officer for the District of Columbia, and the head of OCFO.  Mr. Lee is sued in his official capacity.  At all times relevant to the events, acts, or omissions alleged in this Complaint, Defendant Lee has acted pursuant to his authority as

11

an official of the District. As Chief Financial Officer, Defendant Lee oversees the collection of all fines and fees to the District. Under Defendant Lee, OCFO enforces the Clean Hands Law as follows: (1) OCFO maintains up-to-date records of all individuals owing more than $100 in fines or fees to the District; (2) OCFO maintains an interagency electronic database enabling other District agencies to automatically access these records; and (3) through this database, OCFO furnishes these records to the DMV, which in turn relies on these records to automatically deny driver's licenses to DC residents who owe more than $100 in fees or fees to the District.

## FACTS RELEVANT TO ALL COUNTS

### A. The Establishment of DC's Wealth-Based Driver's License Scheme under the Clean Hands Law

54.     The DC Council passed the original Clean Hands Law in 1996. As enacted, the statute required denial of an application to obtain or renew a driver's licenses and other permits for non-payment of fines and taxes for littering, illegal dumping, and civil infractions assessed by the Department of Consumer and Regulatory Affairs.[1]

55.     The DC Council amended and significantly expanded the scope of the Clean Hands Law in 2001 to add parking and moving infractions to the list of violations that trigger penalties. Under then-amended provisions of the D.C. Code, any DC resident who accumulated more than

---

[1] *See* Clean Hands Before Receiving a License or Permit Act of 1996, D.C. Law 11-118, § 3(a), 43 D.C. Reg. 1191 (codified at D.C. CODE § 47-2862(a)(1)), code.dccouncil.us/dc/council/laws/docs/11-118.pdf); *see also* Report on an Amendment in the Nature of a Substitute to Bill 11-260, the "Clean Hands Before Receiving a License or Permit Act of 1995," COUNCIL OF THE DIST. OF COLUMBIA, COMM. ON PUB. WORKS AND THE ENV'T, 1-2, 16 (Sept. 20, 1995), lims.dccouncil.us/downloads/LIMS/4245/Committee_Report/B11- 0260-CommitteeReport1.pdf.

$100 of parking or traffic debt to the District automatically had an existing driver's license suspended and was automatically disqualified from obtaining or renewing a driver's license.[2]

56.     The Council's stated purpose in enacting the 2001 amendment was to compel people to pay their outstanding fines and fees to generate additional revenue for the District. The Council report accompanying the amendment emphasized that 570,000 tickets dating back to 1979 and worth about $53 million remained outstanding because DC motorists lacked a "compelling reason to respond to the notices of violations." The report concluded that one way to address this backlog was to "condition[] the issuance of any District license or permit on the payment of outstanding fines owed to the District," including fines for parking and traffic violations. Further underscoring the revenue-generation objective of the 2001 amendment, the District was at the time working hard to prove its fiscal responsibility to end the reign of the Financial Control Board and return to greater self-government. Congress had established the Board in 1995 in response to the District's budget crisis.

57.     In 2018 and early 2019, acknowledging the harm that the loss of a driver's license for unpaid tickets inflicted on indigent DC residents, the Council ended the automatic suspension of driver's licenses based on non-payment of parking and traffic debt and certain civil court judgments, and required the DMV to restore all licenses suspended solely on those bases.[3]

---

[2] *See* Motor Vehicle and Safe Driving Amendment Act of 2000, D.C. Law 13-289, § 601, 48 D.C. Reg. 2057 (codified at D.C. CODE § 47-2862(a)(5)).

[3] *See* Traffic and Parking Ticket Penalty Amendment Act of 2018, D.C. Law 22-175, § 2, 65 D.C. Reg. 9546 (enacted Sept. 6, 2018) (effective Oct. 30, 2018) (codified at D.C. CODE § 50-2302.08), lims.dccouncil.us/downloads/ LIMS/37705/Signed_Act/B22-0204-SignedAct.pdf; *see also* Driver's License Revocation Fairness Amendment Act of 2018, D.C. Law 22-236, § 2, 66 D.C. Reg. 590 (enacted Jan. 15, 2019) (effective Mar. 13, 2019), lims.dccouncil. us/downloads/LIMS/39352/Signed_Act/B22-0618-SignedAct.pdf.

58.     As a result of the 2018 and 2019 amendments, the DMV lifted the driver's license suspensions of more than 17,750 DC residents—more than 15,500 who owed debt to the District government and more than 2,250 with outstanding civil court judgments.

59.     Although the non-renewal of a driver's license under the Clean Hands Law functions as a slow-motion suspension, the Council did not amend or reform the Clean Hands Law to eliminate its enforcement against DC residents who owe more than $100 to the District at the time of renewal. Notwithstanding the elimination of the suspension provisions of the D.C. Code in 2018, the Clean Hands Law continues to automatically disqualify DC residents from renewing a driver's license, as well as obtaining one in the first place, if they owe more than $100 in fines or fees.

60.     The Clean Hands Law stands in contrast to District law governing civil money judgments owed by DC residents to private parties. Whereas the Clean Hands Law disqualifies DC residents who owe the District government more than $100 from obtaining or renewing a driver's license, neither the Clean Hands Law nor any other District law imposes that penalty, or any equally harsh penalty, on DC residents required by court order to satisfy debts to private parties.

61.     Under a prior provision of District law, one category of civil money judgment creditors—insurance companies—could register a judgment with the Mayor and petition the Mayor to suspend the judgment debtor's driver's license until the judgment was satisfied. However, as explained in Paragraph 57, the Council repealed this provision in 2019. It thus eliminated the only vestige of District law that treated civil money judgment debtors the same way the Clean Hands Law continues to treat those who over $100 to the District government.

**B.  The Operation of the Clean Hands Law**

62.     Since 2001, the Clean Hands Law has provided in relevant part: "Notwithstanding any other provision of law, the District government shall not issue or reissue a license or permit to any applicant for a license or permit if the applicant: (1) Owes the District more than $100 in outstanding fines, penalties or interest assessed pursuant to the following [enumerated] acts . . . (2) Owes the District more than $100 in past due taxes . . . ; [or] (7) Owes the District more than $100 in outstanding fines, penalties, or interest[.]" D.C. Code § 47-2862(a).

63.     By its plain language, the Clean Hands Law automatically disqualifies DC residents from obtaining or renewing a driver's license (or any type of license or permit) if they owe more than $100 in fines or fees to the District.

64.     Under the Clean Hands Law, the District does not inquire into a DC resident's ability to pay fines or fees of over $100 before refusing to issue or renew a driver's license. To the contrary, the refusal is automatic. DC residents too poor to pay their debts are disqualified from obtaining or renewing their driver's licenses not because of any willful refusal to pay, but rather because of their poverty.

65.     The District enforces the Clean Hands Law for driver's licenses through the DMV and OCFO. When a DC resident applies to the DMV to obtain or renew a driver's license, the DMV checks with a database maintained by the District's Office of Tax and Revenue, within OCFO, to determine whether the resident owes more than $100 in fines, fees, or other debt to the District. If the database reveals that the resident owes more than $100, then the resident's application transaction is automatically terminated, and the application is denied.

66.     On information and belief, the District fails to maintain any record of how many driver's license application transactions are canceled in this manner.

15

67.     On information and belief, thousands of disqualified DC residents do not even attempt to obtain or renew a driver's license because of the Clean Hands Law.

68.     Under the Clean Hands Law, the District has deprived DC residents of their driver's licenses unfairly, without notice, and in error. DC law entitles recipients of parking and traffic tickets to request reconsideration of their tickets and authorizes recipients to appeal an adverse decision. But DC residents often learn of their tickets only after the short deadlines for requests or appeals have passed. In some cases, DC residents who experience homelessness, or who move frequently for other reasons, remain unaware of tickets they have been issued for years, and may not learn of outstanding fines and fees until the District denies them a new or renewed driver's license under the Clean Hands Law. In other cases, District residents do not learn about their tickets until they receive notification by mail from debt collectors. And in yet other cases, DC residents sharing the same name as other drivers are wrongly identified as having parking or traffic debt, but do not learn of that debt—and the District's error—until the District denies them a new or renewed license under the Clean Hands Law.

69.     It does not take much to accrue over $100 in traffic or parking fines and fees in the District. That is especially true for DC residents who are financially unable to pay the originally imposed fine on time.

70.     The District assesses fines for traffic and parking infractions in amounts typically ranging between $50 and $150. To take a few examples, a driver may be assessed a $50 ticket for driving too slowly, 18 DCMR § 2200.10, 18 DCMR § 2600, a $75 ticket for a broken taillight, 18 DCMR § 705.1, 18 DCMR § 2600, or a $100 ticket for parking in a loading zone, 18 DCMR §§ 2402.6, 2601.1, tailgating, 18 DCMR §§ 2201.9, 2600, or turning right at a "no turn on red" sign. 18 DCMR §§ 2203, 2204, 2600.

16

71.     Further, a driver may be assessed a $100 ticket for driving between 11 and 15 miles per hour in excess of the speed limit. This is significant because the District deploys automated traffic enforcement (ATE) cameras throughout the city, including in neighborhoods with high concentrations of residents who are poor.

72.     Failure to pay a ticket in 30 days, or 60 days for red light and speed camera tickets, results in a doubling of the fine amount. D.C. Code § 50-2302.05(d). Thus, even several $25 parking tickets, when doubled, can quickly surpass the $100 threshold.

73.     For failure to pay in 90 days, the District's Department of Motor Vehicles typically sends the fine to a collection agency, which imposes an additional 20% surcharge.

74.     The District does not inquire into a person's ability to pay before either doubling a fine or sending a fine to a collection agency and assessing the additional 20% surcharge.

75.     This enforcement regime has a disproportionately harsh impact on DC residents with low or no income. Assume, for example, that DC Resident A and DC Resident B both receive a $75 ticket for driving with a broken taillight. Resident A has adequate resources and pays the ticket without additional adverse consequences. Resident B, by contrast, lacks the resources to pay and the ability to obtain those resources in a short period, so the fine is doubled to $150 after 30 days and, after 90 days, sent to collections and increased to $180. In addition, under the Clean Hands Law, Resident B is disqualified from renewing their driver's license until the fine is paid, even though they do not have the ability to pay and may well continue to lack the ability to pay at the time of renewal. Thus, for the exact same violation, Resident A, who has the means to pay on time, will pay $75, while Resident B, who lacks such means, will owe $180 and will face a much higher barrier to renewing their driver's license. The only difference between these two individuals is Resident B's poverty.

**C.  The Harms the Clean Hands Law Inflicts on the District and Its Residents**

76.     Despite having received requests to do so, the District does not collect data on the number or demographics of DC residents who are currently unable to obtain or renew a driver's license under the Clean Hands Law. A conservative estimate is that tens of thousands of DC residents are currently disqualified. That rough estimate is based on the fact that, as of the most recently available public data from 2019, DC residents had 175,869 unpaid fines and fees of $100 or more. Even assuming an average ratio of three fines per resident, 58,623 residents are disqualified from obtaining a driver's license—a figure representing over 10% of the District's adult population (575,161) based on the 2020 census.

77.     The harms the Clean Hands Law inflicts on the thousands of DC residents who continue to be ensnared by the law are extensive. Without a driver's license, it is more difficult to navigate the activities of daily living. It is harder to get to the grocery store, take kids to and from childcare, visit and care for elderly relatives, attend doctors' appointments, and travel to and from—and thus hold—a job.

78.     This is not only Plaintiffs' position. It is the position of the United States government. In a Statement of Interest arguing that Virginia's now-repealed version of the Clean Hands Law was unconstitutional, the Department of Justice stressed that the loss of a driver's license "can impose significant harm on the well-being of individuals. Depriving individuals of the use of their vehicle can imperil their ability to earn a living, pursue educational opportunities, and care for family."

79.     The harms Plaintiffs have suffered as a result of the Clean Hands Law, detailed above, are emblematic of the harms DC residents in poverty must endure when automatically deprived of driver's licenses under the Clean Hands Law. Evelyn Parham cannot properly provide

for her disabled mother. Nichole Jones is forced to walk far distances to meet her basic needs and has developed medical ailments. Carlotta Mitchell has had considerable difficulty visiting her family due to her inability to drive. Dominique Roberts struggles to take care of her mother and also her daughter, who, due to her disqualification from driving, is unable to participate in many extracurricular activities. Victor Hall has difficulty getting to his medical and physical therapy appointments. Other than Ms. Roberts, all Plaintiffs, despite having had jobs before, are currently unemployed and hindered by the Clean Hands Law from seeking, obtaining, and retaining new jobs.

80.     Beyond making it more difficult for Plaintiffs and other DC residents of limited means to manage the necessities of daily life, the Clean Hands Law exacts significant societal costs.

81.     The Clean Hands Law exacerbates racial inequality. Available data demonstrates that the harms inflicted by the Clean Hands Law fall disproportionately on Black DC residents. The median White DC household has 81 times more wealth than the median Black DC household, while Black drivers in DC are nearly four times more likely than White drivers to receive traffic tickets. The upshot is that Black DC residents are more likely to be ticketed than White residents, yet less likely to have the resources to pay the corresponding fines. Under the Clean Hands Law, Black DC residents are thus disproportionately more likely lose their ability to obtain or renew a driver's license.

82.     The Clean Hands Law harms DC residents with disabilities, including several Plaintiffs in this case. In 2018, more than 60% of adults with disabilities reported that they drive a car. Yet adults with disabilities are more than twice as likely to experience poverty as adults without disabilities. Many disabled persons are on public assistance and have few assets, making

19

it difficult to save for a financial emergency. Individuals with disabilities are thus at increased risk of being ensnared by the Clean Hands Law. And the impact on them could be even harsher than for those without disabilities: while traveling a mile to a bus or Metro station may be feasible for an individual without disabilities, it is often infeasible for an individual with disabilities.

83.     The Clean Hands Law harms workers. Without a valid driver's license, it is harder for DC residents to find and sustain employment outside the home. Only one in three jobs in the DC metro area is accessible by public transport within 90 minutes, fewer than one in five jobs are accessible within 60 minutes, and fewer than one in ten jobs is accessible within 45 minutes. By necessity, driving remains the most common way for workers to commute to their jobs in the DC metro area. That is particularly true for jobs that offer a pathway out of poverty, including jobs in construction, manufacturing, and security, as well as jobs that have proliferated during the COVID-19 pandemic, such as delivery and rideshare jobs, which plainly require a driver's license.

84.     The Clean Hands Law harms employers. Without the means to reliably commute, an employee may not show up for work, and if an employee loses a job because they can no longer drive, their employer must hire and train a new employee and might have to pay unemployment insurance. In acknowledgment of such consequences, the U.S. Chamber of Commerce and major U.S. financial institutions have called for abolishing laws like the Clean Hands Law. For example, in a July 26, 2021 letter to Congress, CEOs for Racial Action sought to encourage reform, maintaining that, "[w]ithin businesses, debt-based license suspensions contribute to employee turnover, absenteeism, and increase recruiting . . . ."

85.     The Clean Hands Law needlessly exposes DC residents to criminal punishment. In DC, driving without a valid driver's license is a criminal misdemeanor punishable by up to a year in jail and a fine of up to $2,500. Yet because driving is vital for navigating daily life, many people

continue to drive without a license despite the risk of arrest and conviction. Indeed, of the nearly 30,000 arrests for traffic violations made by the DC Metropolitan Police Department between January 2013 and November 2020, driving without a license was the most serious offense the motorist was arrested for nearly 80% of the time—a staggeringly high rate, given that driving without a license is not inherently dangerous.

86.     This burden, too, falls disproportionately on Black DC residents: 70% of DC residents arrested for driving without a license between January 2013 and November 2020 were Black men, even though Black men comprise less than 20% of DC's adult population, and Black DC residents were 19 times more likely than White residents to be arrested for driving without a license.

87.     By expanding the pool of residents at risk of arrest for driving without a valid license, the Clean Hands Law diverts the District's finite public safety resources from addressing serious crime, including violent crime, as well as dangerous traffic offenses. In 2019 alone, DC Metropolitan Police Department officers made 2,797 adult arrests for which the most serious offense was driving without a license. An officer spent an average of 20 minutes to complete each traffic stop. Just completing the traffic stops in these cases consumed 932 hours (38.8 days) of police time. This figure excludes the substantial time officers spent on processing paperwork associated with the arrests.

**D.  The Failure of the Clean Hands Law to Achieve Its Intended Purpose**

88.     The harms the Clean Hands Law inflicts on DC residents in poverty by depriving them of driver's licenses are not justified by the statute's ostensible objective of generating revenue for the District from the payment of outstanding fines and fees.

89.     There is no evidence that withholding a driver's license from someone too poor to pay their debts to the District will somehow incentivize them to come up with money they do not have.

90.     In fact, the Clean Hands Law makes it more difficult for DC residents in poverty to come up with the money. Without a driver's license, DC residents in poverty will find it harder to maintain remunerative work. Without remunerative work, they cannot earn the income they need to pay what they owe and cannot otherwise flourish. The Clean Hands Law thus makes it harder, not easier, for the District to collect its debts from DC residents in poverty. As the United States Department of Justice has observed in the previously referenced Statement of Interest, "[A]utomatic driver's license suspensions do not further the [government]'s interest in ensuring compliance with court orders—particularly with respect to indigent defendants, who remain unable to pay court-ordered fines and fees after their driver's license suspension and may become less able to pay in light of the adverse impact of the suspension on their employment and their lives."

91.     The Clean Hands Law also does little or nothing to encourage payment from others who owe money to the District.

92.     At least 85% of outstanding traffic and parking fines and penalties are owed by non-DC residents. These individuals do not have DC driver's licenses, so the threat of non-renewal of a DC driver's license under the Clean Hands Law does not incentivize them to pay their debts to the District.

93.     DC residents who *can* afford to pay their debts to the District have strong incentives to pay apart from the Clean Hands Law's prohibition on driver's license renewal. These include not only the psychic benefits of paying off debt, but also (i) avoiding the hassle of dealing with

debt collection agencies; (ii) avoiding flags on credit reports and public records often checked by landlords and employers; (iii) avoiding the withholding of DC tax refunds; and (iv) retaining the ability to obtain professional and business licenses and permits requiring a Clean Hands certificate from the DC government.

94.     The Clean Hands Law thus does not incentivize payment of parking and traffic debt by non-DC residents, who owe the vast majority of such debt, or by DC residents who can afford to pay such debt, and the statute makes it harder for DC residents who are too poor to pay, including Plaintiffs, to come up with the money to pay.

95.     Policymakers, academic studies, and courts have recognized the inability of laws like the Clean Hands Law to accomplish their payment-coercion objective.

96.     One study by the American Association of Motor Vehicle Administrators, a consortium of law enforcement agencies, concluded: "The common belief that a driver['s] license suspension provides effective, sustainable motivation to encourage individuals to comply with court ordered or legislated mandates to avoid suspension is not supported by empirical evidence."

97.     In 2017, in a signing statement explaining his support for a reform of a California law that automatically suspended driver's licenses for unpaid fines, then-Governor Jerry Brown observed: "There does not appear to be a strong connection between suspending someone's driver[']s license and collecting their fine or penalty. Often, the primary consequence of a driver[']s license suspension is the inability to legally drive to work or take one's children to school."

98.     The City of Dallas, Texas, like the District, uses a computer program that automatically places a hold on a driver's license when someone fails to pay a fine or fee. The

neighboring City of Fort Worth, Texas does not use such a program. Yet Fort Worth collects more per case ($116) than Dallas ($113).

99.     In a decision ruling that Virginia's now-repealed law suspending driver's licenses for unpaid debts was likely unconstitutional, the U.S. District Court for the Western District of Virginia found that the evidence it had received showed "[t]here is no indication that a loss of [a] license will incentivize individuals to pay court fines and costs where those individuals simply cannot afford to pay." The Court continued: "In practice, the loss of a driver's license adversely affects people's ability to gain and maintain employment, often resulting in a reduction of income. This deprives individuals of means to pay their court debt, *hindering* the fiscal interests of the government." *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 531 (W.D. Va. 2018) (emphasis added).

100.    Laws like the Clean Hands Law are not only ineffectual and counterproductive, but also inferior to other methods of securing debt repayment from people of limited means. Empirical evidence suggests that tailoring debt from fines and fees to debtors' ability to pay is more effective at obtaining repayment than punishing debtors for failing to pay a traditional, fixed amount.

101.    For example, an Iowa county recently found that when it decreased civil fines by an average of $40 based on ability to pay, the average amount collected jumped by more than $160, from $197 to $360.

102.    Similarly, a recent review of data in Maricopa County, Arizona found that, within a specified range for each offense, criminal defendants sentenced to fines adjusted for income paid nearly twice as much as defendants sentenced to traditional, non-income-adjusted fines. This was so even though the defendants sentenced to income-adjusted fines generally received lower fines. Moreover, the defendants sentenced to income-adjusted fines paid at least something toward their

fines at a rate 19% higher than the defendants sentenced to non-income-adjusted fines (96% vs. 77%) and were also far more likely to pay their fines in full within a year (52.7% vs. 20.3%).

## CAUSES OF ACTION

### COUNT I
### Violation of Fifth Amendment Right to
### Procedural Due Process under 42 U.S.C. § 1983
### (Against All Defendants)

103.    Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

104.    The procedural due process guarantee of the Fifth Amendment to the United States Constitution applies to the acts and omissions of the District and its officials.

105.    This Fifth Amendment guarantee is enforceable against Defendants through 42 U.S.C. § 1983.

106.    DC residents, including Plaintiffs, have a constitutionally protected property and liberty interest in retaining a driver's license.

107.    Because Plaintiffs and other DC residents have a constitutionally protected interest in retaining a driver's license, the Due Process Clause of the Fifth Amendment requires Defendants to provide them with procedural due process before refusing to issue or renew a driver's license for them.

108.    Procedural due process requires that, before disqualifying Plaintiffs and other DC residents from obtaining or renewing a driver's license for non-payment of debt to the District, Defendants must notify them of the existence of such debt, conduct an inquiry into their ability to pay such debt, provide them an opportunity to establish their inability to pay such debt, and determine that the non-payment of such debt is willful.

109.    The Clean Hands Law provides none of these procedures. It automatically disqualifies Plaintiffs and other DC residents who owe the District more than $100 from obtaining or renewing a driver's license—without establishing a process for inquiring into their ability to pay such debt, without providing residents an opportunity to prove their inability to pay to such debt, without requiring a determination that non-payment of such debt is willful, and sometimes without even notifying them of the existence of such debt in the first place.

110.    Defendants' enforcement of the Clean Hands Law against Plaintiffs thus violates procedural due process.

111.    As a result of Defendants' violation of Plaintiffs' procedural due process rights, Plaintiffs have suffered and continue to suffer harm, including but not limited to difficulty finding and maintaining employment, attending medical appointments, visiting and caring for family members, and fulfilling the other necessities of daily life.

**COUNT II**
**Violation of Fifth Amendment Right to Due Process**
**and Equal Protection under 42 U.S.C. § 1983**
**(Against All Defendants)**

112.    Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

113.    The due process and equal protection guarantees of the Fifth Amendment to the United States Constitution apply to the acts and omissions of the District and its officials.

114.    DC residents, including Plaintiffs, have a right, located at the convergence of the Fifth Amendment's due process and equal protection guarantees, not to be punished by Defendants because of their poverty.

115.    The Fifth Amendment thus bars Defendants from depriving Plaintiffs and other DC residents of their driver's licenses because of their debts without inquiring into their ability to

satisfy those debts and thus without determining that the nonpayment of those debts is willful and not because of their poverty.

116.    This Fifth Amendment right is enforceable against Defendants through 42 U.S.C. § 1983.

117.    By enforcing the Clean Hands Law against Plaintiffs, Defendants are violating this Fifth Amendment right, as they are barring Plaintiffs from obtaining or renewing their driver's licenses based on their debts to the District without inquiring into their ability to satisfy those debts and thus without determining that the nonpayment of those debts is willful and not because of their poverty.

118.    Plaintiffs' nonpayment of their debts to the District is not, in fact, willful. Plaintiffs want to pay their debts but are financially unable to do so.

119.    Defendants' enforcement of the Clean Hands Law against Plaintiffs and other DC residents financially unable to pay their parking and traffic debts to the District embodies elements of punitiveness and discrimination that violate the rights of citizens to equal treatment under the law.

120.    As a result of Defendants' violation of Plaintiffs' Fifth Amendment right located at the convergence of due process and equal protection principles, Plaintiffs have suffered and continue to suffer harm, including but not limited to difficulty finding and maintaining employment, attending medical appointments, visiting and caring for family members, and fulfilling the other necessities of daily life.

**COUNT III**
**Violation of Fifth Amendment Right to**
**Equal Protection under 42 U.S.C. § 1983**
**(Against All Defendants)**

121.    Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

27

122.    The equal protection guarantee of the Fifth Amendment to the United States Constitution applies to the acts and omissions of the District and its officials.

123.    The equal protection guarantee of the Fifth Amendment prohibits disparate, discriminatory debt collection laws and practices. It thus prohibits Defendants from imposing on Plaintiffs, as well as other DC residents of limited means who are in debt to the District government, remedies that are harsher than the remedies District law imposes on DC residents with civil money judgments to private parties.

124.    This Fifth Amendment guarantee is enforceable against Defendants through 42 U.S.C. § 1983.

125.    Defendants are violating this Fifth Amendment guarantee by enforcing the Clean Hands Law to disqualify Plaintiffs from obtaining or renewing driver's licenses based on their debts to the District government, but providing greater protections to, and thus not similarly penalizing, DC residents with civil money judgment debts to non-government parties.

126.    As a result of Defendants' violation of Plaintiffs' rights under the Fifth Amendment's equal protection guarantee, Plaintiffs have suffered and continue to suffer harm, including but not limited to difficulty finding and maintaining employment, attending medical appointments, visiting and caring for family members, and fulfilling the other necessities of daily life.

**COUNT IV**
**Violation of Fifth Amendment Right to**
**Substantive Due Process under 42 U.S.C. § 1983**
**(Against All Defendants)**

127.    Plaintiffs re-allege and incorporate by reference all of the foregoing paragraphs.

128.    The substantive due process guarantee of the Fifth Amendment to the United States Constitution applies to the acts and omissions of the District and its officials.

28

129.    This Fifth Amendment guarantee is enforceable against Defendants through 42 U.S.C. § 1983.

130.    DC residents, including Plaintiffs, have a constitutionally protected property and liberty interest in obtaining and retaining a driver's license.

131.    Substantive due process requires that any deprivation of Plaintiffs' and other DC residents' protected interest in a driver's license under the Clean Hands Law must be rationally related to a legitimate government objective.

132.    The objective the DC Council articulated for the Clean Hand Law's prohibition on obtaining and renewing driver's licenses based on unpaid debt to the District is to secure the payment of that debt so as to generate revenue for the District.

133.    Withholding driver's licenses from Plaintiffs and DC residents in poverty does not achieve that objective. No evidence indicates that being deprived of a driver's license will incentivize Plaintiffs or similarly situated DC residents to pay fines and fees they cannot afford to pay.

134.    The Clean Hands Law not only fails to achieve its intended objective but undermines it. Rather than securing debt payments and generating revenue from DC residents in poverty, the Clean Hands Law makes it more difficult to secure payment and generate revenue because it makes it harder for Plaintiffs and similarly situated DC residents to find and sustain employment that would enable them to satisfy their debts.

135.    Inasmuch as the Clean Hands Law not only fails to achieve its intended objective, but undermines that objective, Defendants' enforcement of the Clean Hands Law is not rationally related to any legitimate government purpose.

136.    Defendants' enforcement of the Clean Hands Law against Plaintiffs thus violates substantive due process.

137.    As a result of Defendants' violation of Plaintiffs' substantive due process rights, Plaintiffs have suffered and continue to suffer harm, including but not limited to difficulty finding and maintaining employment, attending medical appointments, visiting and caring for family members, and fulfilling the other necessities of daily life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.    Entry of judgment against Defendants on all Counts;

b.    A declaration that Defendants' enforcement of the Clean Hands Law against Plaintiffs is unlawful and violates Plaintiffs' rights under the Fifth Amendment to the United States Constitution, as alleged here;

c.    Preliminary and permanent injunctions prohibiting Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with them or on their behalf from enforcing the Clean Hands Law to deny applications from Plaintiffs for driver's licenses because of unpaid debt;

d.    An award of attorneys' fees and costs under 42 U.S.C. §1988; and

e.    Such other and further relief as this Court may deem necessary and appropriate.

**DATE**: July 20, 2022

Respectfully Submitted,

*/s/ Ariel Levinson-Waldman*                              */s/ Seth Rosenthal*

Ariel Levinson-Waldman (Bar # 474429)        Seth Rosenthal (Bar # 482586)
Joshua M. Levin (Bar # 1048088)                    Claude Bailey (Bar # 378000)

Tzedek DC
UDC David A. Clarke School of Law
4340 Connecticut Ave NW, Suite 319
Washington, DC 20008
Tel: (202) 441-9959
alw@tzedekdc.org
jl@tzedekdc.org

Andrew Dickson (Bar # 1618684)
Spencer Kaye (Bar # 1723914)
Kirsten Bickelman (Bar # 1780402)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C.  20001
Tel: (202) 344-4000
sarosenthal@venable.com
cebailey@venable.com
abdickson@venable.com
srkaye@venable.com
knbickelman@venable.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2022, a true and correct copy of the foregoing was filed via the CaseFile Xpress electronic filing service.

I further certify that, on the 14th day of July, 2022, Chad Copeland, Deputy Attorney General, Civil Litigation Division of the Office of the Attorney General for the District of Columbia, consented to service via e-mail only for all Defendants, and a copy of the foregoing was served via e-mail on the following:

> Chad Copeland
> Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Chad.Copeland@dc.gov
>
> Stephanie Litos
> Assistant Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Stephanie.Litos@dc.gov
>
> Fernando Amarillas
> Assistant Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Fernando.Amarillas@dc.gov
>
> Tonia Robinson
> Office of the Attorney General for the District of Columbia
> Tonia.Robinson@dc.gov

DATED: July 20, 2022          Tzedek DC

/s/ Ariel Levinson-Waldman
D.C. Bar # 474429
*Counsel for Plaintiffs*

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Evelyn Parham, et al.
_____
                                                    Plaintiff

vs.
                                                                    Case Number   2022 CA 003151 B

District of Columbia
_____
                                                    Defendant

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Ariel Levinson-Waldman
_____
Name of Plaintiff's Attorney                          Clerk of the Court

Tzedek DC
_____              By _____
Address                                                                    Deputy Clerk
4340 Connecticut Ave NW, Suite 319, Washington, DC 20008

(202) 441-9959
_____              Date        07/26/2022
Telephone
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하 시면, (202) 879-4828로 전화주십시요    የአማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

Evelyn Parham, et al.
_____
                              Demandante

                    contra

                                                          Número de Caso:   2022 CA 003151 B

District of Columbia
_____
                              Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Ariel Levinson-Waldman
_____
Nombre del abogado del Demandante                         SECRETARIO DEL TRIBUNAL

Tzedek DC
_____
Dirección                                                Por: _____
                                                              Subsecretario
4340 Connecticut Ave NW, Suite 319, Washington, DC 20008

(202) 441-9959
_____                         Fecha   07/26/2022
Teléfono
如需翻译, 请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 통역을 원하시면 (202) 879-4828로 전화하십시오.       የትርጉም እገዛ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Evelyn Parham, et al.
_____
Plaintiff

vs.

Case Number    2022 CA 003151 B

Gabriel Robinson
_____
Defendant

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Ariel Levinson-Waldman
_____
Name of Plaintiff's Attorney

Tzedek DC
_____
Address

4340 Connecticut Ave NW, Suite 319, Washington, DC 20008

(202) 441-9959
_____
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요    የአማርኛ ትርጉም ለማማናት (202) 879-4828 ይደውሉ

_Clerk of the Court_

By _____
Deputy Clerk

Date    07/26/2022   _____

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Evelyn Parham, et al.
_____
                              Demandante

          contra

Gabriel Robinson                          Número de Caso: | 2022 CA 003151 B
_____
                              Demandado

**CITATORIO**

Al susodicho Demandado:

    Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

    A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Ariel Levinson-Waldman
_____
Nombre del abogado del Demandante

Tzedek DC
_____
Dirección

4340 Connecticut Ave NW, Suite 319, Washington, DC 20008
_____

(202) 441-9959
_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
                    Subsecretario

Fecha: 07/26/2022
_____

如需翻译, 请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 번역을 원하시면 (202) 879-4828 로 전화주십시요.    ለ ትርጉም ፍላጐት ካለዎት (202) 879-4828 ይደውሉ

    IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

    Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Evelyn Parham, et al.
_____
                                    Plaintiff

vs.                                                    Case Number  2022 CA 003151 B

Glen Lee
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

      You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

      You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Ariel Levinson-Waldman
_____
Name of Plaintiff's Attorney

Tzedek DC
_____
Address

4340 Connecticut Ave NW, Suite 319, Washington, DC 20008

(202) 441-9959
_____
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요    ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

*Clerk of the Court*

By _____
                              Deputy Clerk

Date _____ 07/26/2022

      IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

      If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                         Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Evelyn Parham, et al.
_____
                              Demandante

          contra

                                        Número de Caso: 2022 CA 003151 B

Glen Lee
_____
                              Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Ariel Levinson-Waldman
_____
Nombre del abogado del Demandante

                                        *SECRETARIO DEL TRIBUNAL*

Tzedek DC
_____
Dirección                                Por: _____
                                                    *Subsecretario*
4340 Connecticut Ave NW, Suite 319, Washington, DC 20008

(202) 441-9959
_____               Fecha 07/26/2022
Teléfono

如需翻译, 请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화하십시오.                             የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                        Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

| | |
|---|---|
| Evelyn Parham, et al. | Case Number: __2022 CA 003151 B__ |
| vs | Date: __July 18, 2022__ |
| District of Columbia, et al. | [X] One of the defendants is being sued in their official capacity. |

| | |
|---|---|
| Name: *(Please Print)*<br>Ariel Levinson-Waldman | Relationship to Lawsuit |
| Firm Name:<br>Tzedek DC | [X] Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>(202) 441-9959                474429 | [ ] Self (Pro Se)<br>[ ] Other: _____ |

TYPE OF CASE:  [X] Non-Jury        [ ] 6 Person Jury        [ ] 12 Person Jury

Demand: $ __Declaratory__                                  Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| [ ] 01 Breach of Contract | [ ] 14 Under $25,000 Pltf. Grants Consent | [ ] 16 Under $25,000 Consent Denied |
| [ ] 02 Breach of Warranty | [ ] 17 OVER $25,000 Pltf. Grants Consent | [ ] 18 OVER $25,000 Consent Denied |
| [ ] 06 Negotiable Instrument | [ ] 27 Insurance/Subrogation | [ ] 26 Insurance/Subrogation |
| [ ] 07 Personal Property |     Over $25,000 Pltf. Grants Consent |     Over $25,000 Consent Denied |
| [ ] 13 Employment Discrimination | [ ] 07 Insurance/Subrogation | [ ] 34 Insurance/Subrogation |
| [ ] 15 Special Education Fees |     Under $25,000 Pltf. Grants Consent |     Under $25,000 Consent Denied |
| | [ ] 28 Motion to Confirm Arbitration | |
| |     Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| [ ] 01 Automobile | [ ] 03 Destruction of Private Property | [ ] 05 Trespass |
| [ ] 02 Conversion | [ ] 04 Property Damage | |
| [ ] 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| [ ] 01 Abuse of Process | [ ] 10 Invasion of Privacy | [ ] 17 Personal Injury- (Not Automobile, Not Malpractice) |
| [ ] 02 Alienation of Affection | [ ] 11 Libel and Slander | [ ] 18 Wrongful Death (Not Malpractice) |
| [ ] 03 Assault and Battery | [ ] 12 Malicious Interference | [ ] 19 Wrongful Eviction |
| [ ] 04 Automobile- Personal Injury | [ ] 13 Malicious Prosecution | [ ] 20 Friendly Suit |
| [ ] 05 Deceit (Misrepresentation) | [ ] 14 Malpractice Legal | [ ] 21 Asbestos |
| [ ] 06 False Accusation | [ ] 15 Malpractice Medical (Including Wrongful Death) | [ ] 22 Toxic/Mass Torts |
| [ ] 07 False Arrest | [ ] 16 Negligence- (Not Automobile, Not Malpractice) | [ ] 23 Tobacco |
| [ ] 08 Fraud | | [ ] 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

**C. OTHERS**

| | |
|---|---|
| ☐ 01 Accounting | ☐ 17 Merit Personnel Act (OEA) |
| ☐ 02 Att. Before Judgment | (D.C. Code Title 1, Chapter 6) |
| ☐ 05 Ejectment | ☐ 18 Product Liability |
| ☐ 09 Special Writ/Warrants | |
| (DC Code § 11-941) | ☐ 24 Application to Confirm, Modify, |
| ☐ 10  Traffic Adjudication | Vacate Arbitration Award (DC Code § 16-4401) |
| ☐ 11 Writ of Replevin | ☐ 29 Merit Personnel Act (OHR) |
| ☐ 12 Enforce Mechanics Lien | ☐ 31 Housing Code Regulations |
| ☒ 16 Declaratory Judgment | ☐ 32 Qui Tam |
| | ☐ 33 Whistleblower |

**II.**

| | | |
|---|---|---|
| ☐ 03 Change of Name | ☐ 15 Libel of Information | ☐ 21 Petition for Subpoena |
| ☐ 06 Foreign Judgment/Domestic | ☐ 19 Enter Administrative Order as | [Rule 28-I (b)] |
| ☐ 08 Foreign Judgment/International | Judgment [ D.C. Code § | ☐ 22 Release Mechanics Lien |
| ☐ 13 Correction of Birth Certificate | 2-1802.03 (h) or 32-151 9 (a)] | ☐ 23 Rule 27(a)(1) |
| ☐ 14 Correction of Marriage | ☐ 20 Master Meter (D.C. Code § | (Perpetuate Testimony) |
| Certificate | 42-3301, et seq.) | ☐ 24 Petition for Structured Settlement |
| ☐ 26 Petition for Civil Asset Forfeiture (Vehicle) | | ☐ 25 Petition for Liquidation |
| ☐ 27 Petition for Civil Asset Forfeiture (Currency) | | |
| ☐ 28 Petition for Civil Asset Forfeiture (Other) | | |

**D.  REAL PROPERTY**

| | |
|---|---|
| ☐ 09 Real Property-Real Estate | ☐ 08 Quiet Title |
| ☐ 12 Specific Performance | ☐ 25 Liens: Tax / Water Consent Granted |
| ☐ 04 Condemnation (Eminent Domain) | ☐ 30 Liens: Tax / Water Consent Denied |
| ☐ 10 Mortgage Foreclosure/Judicial Sale | ☐ 31 Tax Lien Bid Off Certificate Consent Granted |
| ☐ 11 Petition for Civil Asset Forfeiture (RP) | |

/s/ Ariel Levinson-Waldman                          July 18, 2022

Attorney's Signature                                       Date

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

EVELYN PARHAM et al
    Vs.                                 C.A. No.      2022 CA 003151 B
DISTRICT OF COLUMBIA et al

## INITIAL ORDER AND ADDENDUM

### Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge HEIDI M PASICHOW
Date:      July 21, 2022
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, October 28, 2022
Location:   Courtroom 516
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

                             CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,     "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

**Civil Remote Hearing Instructions for Participants**

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:**   (AUDIO ONLY/Dial-in by Phone):

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

- *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise.  If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the **Audio Alternative**

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page:
https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address
https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page



**AUDIO ALTERNATIVE:**  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.

**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #**2

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

CAIO-60

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60

Filed
D.C. Superior Court
07/21/2022 17:43PM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

---

**EVELYN PARHAM, NICHOLE JONES,
CARLOTTA MITCHELL, DOMINIQUE
ROBERTS**, and **VICTOR HALL**,

*Plaintiffs*,

v.

**DISTRICT OF COLUMBIA**; **GABRIEL
ROBINSON**, Director of the District of
Columbia Department of Motor Vehicles, in his
official capacity; **GLEN LEE**, Chief Financial
Officer for the District of Columbia, in his
official capacity,

*Defendants*.

**Case No.: 2022 CA 003151 B**

**Hon. Heidi M. Pasichow—Civil
Calendar 12**

**Next Event: Initial Scheduling
Conference—October 28, 2022, 9:30
AM**

---

**PLAINTIFFS' UNOPPOSED MOTION FOR ENLARGEMENT OF PAGE LIMITS
FOR PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INUNCTION**

Pursuant to the Court's Supplement to the General Order, and without opposition from

Defendants, Plaintiffs move for an order enlarging the page limit to 50 pages for Plaintiffs'

forthcoming Memorandum of Points and Authorities in Support of Their Motion for Preliminary

Injunction ("Memorandum"). A copy of Plaintiffs' Memorandum is attached as Exhibit A. In

support of their Motion, Plaintiffs state as follows:

1.      On July 20, 2022, Plaintiffs filed their Complaint which alleges that enforcement

of the Clean Hands Law violates their Fifth Amendment rights.

2.      On July 21, 2022, Plaintiffs' case was assigned to Judge Heidi M. Pasichow.

3.      Pursuant to Judge Pasichow's Supplement to the General Order, "No party may submit a motion and memorandum more than twenty (20) pages long (double spaced) without leave of Judge Pasichow."

4.      Good cause exists to grant the enlargement. Plaintiffs Memorandum was drafted in advance of their case being assigned to Judge Pasichow and—prior to assignment and learning of Judge Pasichow's Supplement to the General Order—their intent was to file a preliminary injunction immediately upon being provided a case number by the Clerk's Offices for Superior Court.  A courtesy copy of Plaintiffs' Memorandum was provided Defendants' counsel on July 18, 2022.  It is not feasible for Plaintiffs to adequately set forth the circumstances within the current page limit in a manner that provides the Court sufficient context.  This case presents significant questions about the constitutionality of continued enforcement of a D.C. statute against Plaintiffs. As shown in Exhibit A to this motion, the Memorandum sets forth the statutory framework, how the statute operates, and how it has impacted Plaintiffs and the public.  As required by governing law, the Memorandum then details and applies to this case the four factors governing whether issuance of a preliminary injunction is warranted.  Under the full set of circumstance, enlargement is warranted.

5.      Defendants do not oppose enlargement of the page limit to 50 pages and will not be prejudiced by the enlargement.

For these reasons, Plaintiffs respectfully request that the Court enlarge to 50 pages the page limit for Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Preliminary Injunction.

For the Court's convenience, a proposed order granting the request to enlarge to 50 page

the page limit for Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion

for Preliminary Injunction is attached.

## RULE 12-I CERTIFICATION

Counsel for Plaintiffs certifies that, on July 21, 2022, they contacted counsel for

Defendants at the Office of the Attorney General to seek consent to the relief requested in this

Motion and that counsel for Defendants indicated that Defendants take no position and do not

oppose Plaintiffs' relief requested.


Respectfully Submitted,

_/s/ Ariel Levinson-Waldman_                          _/s/ Seth Rosenthal_

Ariel Levinson-Waldman (Bar # 474429)            Seth Rosenthal (Bar # 482586)
Joshua M. Levin (Bar # 1048088)                   Claude Bailey (Bar # 378000)
Tzedek DC                                         Andrew Dickson (Bar # 1618684)
UDC David A. Clarke School of Law                 Spencer Kaye (Bar # 1723914)
4340 Connecticut Ave NW, Suite 319                Kirsten Bickelman (Bar # 1780402)
Washington, DC 20008                              VENABLE LLP
Tel: (202) 441-9959                               600 Massachusetts Avenue, NW
alw@tzedekdc.org                                  Washington, D.C.  20001
jl@tzedekdc.org                                   Tel: (202) 344-4000
                                                  sarosenthal@venable.com
                                                  cebailey@venable.com
                                                  abdickson@venable.com
                                                  srkaye@venable.com
                                                  knbickelman@venable.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of July, 2022, a true and correct copy of the foregoing was filed via the CaseFile Xpress electronic filing service.

I further certify that, on the 14th day of July, 2022, Chad Copeland, Deputy Attorney General, Civil Litigation Division of the Office of the Attorney General for the District of Columbia, consented to service via e-mail only for all Defendants, and a copy of the foregoing was served via e-mail on the following:

> Chad Copeland
> Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Chad.Copeland@dc.gov
>
> Stephanie Litos
> Assistant Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Stephanie.Litos@dc.gov
>
> Fernando Amarillas
> Assistant Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General for the District of Columbia
> Fernando.Amarillas@dc.gov
>
> Tonia Robinson
> Office of the Attorney General for the District of Columbia
> Tonia.Robinson@dc.gov

DATED: July 21, 2022            Tzedek DC

                               /s/ Ariel Levinson-Waldman
                               D.C. Bar # 474429
                               *Counsel for Plaintiffs*

4

# Exhibit A

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

---

**EVELYN PARHAM**, **NICHOLE JONES**,
**CARLOTTA MITCHELL**, **DOMINIQUE**
**ROBERTS**, and **VICTOR HALL**,

                *Plaintiffs*,

    v.

**DISTRICT OF COLUMBIA**; **GABRIEL**
**ROBINSON**, Director of the District of
Columbia Department of Motor Vehicles, in his
official capacity; **GLEN LEE**, Chief Financial
Officer for the District of Columbia, in his
official capacity,

                *Defendants*.

Case No.:

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

**Table of Contents**

INTRODUCTION ............................................................................................................................. 1

FACTS ............................................................................................................................................... 4

   I.   The Establishment of D.C.'s Payment-Based Driver's License Scheme under the Clean
       Hands Law ................................................................................................................................ 4

   II.  The Operation of the Clean Hands Law ................................................................................. 6

   III. The Harms the Clean Hands Law Inflicts on Plaintiffs, Other District Residents of Limited
       Means, and the General Public ............................................................................................. 10

       A.  Ongoing Harms to Plaintiffs ......................................................................................... 11

       B.  Broader Societal Harms ................................................................................................ 16

       C.  The District's Recent Legislative Recognition of the Harms that Its Wealth-Based
           Driver's License Scheme Inflicts on District Residents ............................................... 21

   IV. The Failure of the Clean Hands Law to Achieve Its Intended Purpose ............................ 25

ARGUMENT .................................................................................................................................. 29

   I.   There Is a Substantial Likelihood Plaintiffs Will Prevail on Counts I and II. ................... 30

       A.  Defendants have violated Plaintiffs' procedural due process rights by failing to
           provide them the opportunity for a hearing before depriving them of driver's licenses
           based on debt owed to the District. ............................................................................... 31

       B.  By automatically disqualifying Plaintiffs from renewing their drivers' licenses based
           on the nonpayment of their parking and traffic tickets, without any inquiry into their
           ability to pay, Defendants have violated Plaintiffs' due process and equal protection
           rights. ............................................................................................................................ 41

   II.  Plaintiffs Are Now Suffering and Will Continue to Suffer Irreparable Injury Unless the
       Court Grants a Preliminary Injunction ............................................................................... 44

   III. The Equities Strongly Favor Plaintiffs ............................................................................... 46

   IV. An Injunction Will Serve the Public Interest ..................................................................... 48

CONCLUSION ............................................................................................................................... 50

Plaintiffs are five District of Columba residents prohibited by District law from renewing their driver's licenses because they are too poor to pay more than $100 in fines and fees owed for parking and minor traffic violations. Plaintiffs submit this brief in support of their Motion for Preliminary Injunction ("Motion"), which, if granted, will enable them to apply to renew their licenses.

## INTRODUCTION

The District of Columbia operates a payment-based driver's license scheme under what is known as the "Clean Hands Law." D.C. Code § 47-2861, *et seq*. That law disqualifies Plaintiffs and thousands of fellow D.C. residents in poverty from obtaining or renewing a driver's license as punishment for owing the District more than $100 in parking, traffic, or other fines or fees. Disqualification under the statute is automatic: in disqualifying Plaintiffs and other D.C. residents who owe more than $100 from obtaining or renewing their driver's licenses based solely on unpaid fines and fees, the Clean Hands Law provides for no inquiry into their ability to pay and requires no determination that their failure to pay is willful.

For D.C. residents who can afford to pay their parking and traffic tickets, the Clean Hands Law is relatively inconsequential. These residents typically enter a credit card account number into an online payment portal established by the District, obtain a receipt of payment, and move on with their lives.

For residents who cannot afford to pay their parking and traffic tickets, such as the five Plaintiffs here, the impact of the Clean Hands Law is severe and often life-altering. Without a driver's license, Plaintiffs struggle with essential daily activities, including finding and keeping a job, purchasing food at the grocery store, attending medical appointments, transporting children to

childcare, and visiting and caring for elderly relatives. The Clean Hands Law punishes Plaintiffs for their poverty and intensifies the instability of their everyday lives.

Plaintiffs are entitled to a preliminary injunction that prohibits Defendants from continuing to enforce the Clean Hands Law against them. Each of the familiar factors for determining whether to issue a preliminary injunction weighs heavily in Plaintiffs' favor:

*First*, Plaintiffs' claims are strong on the merits. Defendants' enforcement of the Clean Hands Law violates Plaintiffs' Fifth Amendment rights in at least two ways, either of which independently warrants preliminary injunctive relief. To begin, Plaintiffs are likely to establish that Defendants have violated their procedural due process rights because, under the Clean Hands Law, Defendants afforded them no hearing *at all* prior to depriving them of their constitutionally protected property interest in a driver's license. Defendants' actions under the Clean Hands Law fly in the face of the Supreme Court's pronouncement more than 50 years ago that, "except in emergency situations" directly implicating public safety, procedural due process obligates the government to provide driver's license holders a hearing "***before*** the termination [of their interest in a license] becomes effective." *Bell v. Burson*, 402 U.S. 535, 542 (1971) (emphasis added); *see also Quick v. Dep't of Motor Vehicles*, 331 A.2d 319, 321 (D.C. 1975).

Plaintiffs are also likely to establish that Defendants are violating the Fifth Amendment at the "convergence" of its due process and equal protection guarantees. That is because Defendants have deprived Plaintiffs of their driver's licenses without any inquiry into their ability to pay their outstanding fines and fees and, thus, without any determination that their failure to pay is willful rather than a consquence of their poverty. Put differently, Defendants are unlawfully discriminating against and punishing Plaintiffs for their poverty by enforcing a scheme in which Plaintiffs and others who are too poor to pay their fines and fees get penalized, while individuals

2

who can afford to pay the same fines and fees for the exact same conduct do not. *See Bearden v. Georgia*, 461 U.S. 660, 668–73 (1983).

*Second*, Plaintiffs are suffering—and will continue to suffer—irreparable harm in the absence of a preliminary injunction. The ongoing violation of their constitutional rights presumptively establishes such harm. *See District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000) ("a violation of constitutional rights constitutes . . . irreparable harm *per se*"). The deleterious impact of the Clean Hands Law on Plaintiffs' daily lives amply confirms this presumption.

*Third*, the equities strongly favor a preliminary injunction. Plaintiffs will benefit materially from regaining the opportunity to drive a car lawfully. With a license, Plainitffs can more readily seek, find, and keep a job, travel to doctor's appointments, transport their children to school and activities, and visit and assist aging relatives. Defendants, by contrast, will suffer zero harm—and in fact might benefit, because restoring Plaintiffs' opportunity to drive might enable those Plaintiffs who are out of work to find work, which would in turn enhance their ability to pay their debts.

*Fourth*, the public interest compels granting the Motion. The Clean Hands Law not only harms Plaintiffs and other District residents of limited means, but also exacts substantial societal costs. It exacerbates racial inequality, compromises employers' ability to maintain a stable workforce, needlessly exposes poor people to criminal punishment for an offense (driving without a license) that is not inherently unsafe, and diverts law enforcement resources away from addressing serious crime. Further, the Clean Hands Law inflicts all of this damage without even plausibly advancing its payment-coercion, revenue-generation objective. The public will benefit

3

from promptly enabling Plaintiffs to participate more fully in their family lives and in society by renewing their driver's licesnes, and neither the District nor its residents face any resulting harm.

Plaintiffs acknowledge that the D.C. Council just enacted a new law that would repeal the provision of the Clean Hands Law challenged here. But this new law—even if signed by the Mayor and approved by Congress under the Home Rule Act—will not take effect until at the earliest October 1, 2023, over 14 months from now. Thus, for the next 14-plus months, in the absence of a preliminary injunction, the Clean Hands Law will continue inflicting harm on Plaintiffs every day, in violation of their Fifth Amendment rights. The new law provides them no interim relief. What it does, instead, is reinforce the need for a prompt judicial remedy, because with the passage of the new law, the District has now officially validated Plaintiffs' contention that the current version of the statute inequitably punishes District residents of limited means. A preliminary injunction is warranted.[1]

## FACTS

### I.     The Establishment of D.C.'s Payment-Based Driver's License Scheme under the Clean Hands Law

For more than two decades, the District has operated a payment-based driver's license scheme that perpetuates the poverty of its poorest residents. The District enforces this scheme

---

[1] Plaintiffs watched patiently—for over a year—as the D.C. Council introduced and considered legislation to reform the Clean Hands Law. They hoped the legislation would provide them the relief this Motion now seeks. On July 12, 2022, after a number of fits and starts, the Council finally did repeal the provision of the Clean Hands Law that disqualifies Plaintiffs and other District residents of limited means from obtaining or renewing driver's licenses. But as explained above, the Council did so only prospectively. At best, Plaintiffs will remain unable to drive lawfully for 14 ½ months, if not more. Several weeks before the new law passed, after learning that this would be the likely outcome of the legislative process, Plaintiffs, through counsel, approached the Office of the Attorney General to explore the possibility of pre-suit resolution with the government Defendants here. Those efforts proved fruitless. Plaintiffs have tried everything to end their predicament without litigation. They can wait no longer.

4

through the so-called "Clean Hands Law," D.C. Code § 47-2861, *et seq.*, which punishes Plaintiffs and all other D.C. residents owing the District government more than $100 in parking, traffic, or other fines or fees by automatically disqualifying them from obtaining or renewing a driver's license with no inquiry into their ability to pay.

The D.C. Council passed the original Clean Hands Law in 1996. As initially enacted, the statute required denial of an application to obtain or renew a driver's licenses and other permits for non-payment of fines and taxes for littering, illegal dumping, and civil infractions assessed by the Department of Consumer and Regulatory Affairs. *See* Clean Hands Before Receiving a License or Permit Act of 1996, D.C. Law 11-118, § 3(a), 43 D.C. Reg. 1191 (codified at D.C. Code § 47-2862(a)(1)).

In 2001, the Council expanded the scope of the Clean Hands Law to include parking and moving infractions to the list of violations that trigger penalties. *See* Motor Vehicle and Safe Driving Amendment Act of 2000, D.C. Law 13-289, § 601, 48 D.C. Reg. 2057 (codified at D.C. Code § 47-2862(a)(5)). In pertinent part, as amended, the Clean Hands Law now provides:

> Notwithstanding any other provision of law, the District government shall not issue or reissue a license or permit to any applicant for a license or permit if the applicant:
>
> (1) Owes the District more than $100 in outstanding fines, penalties, or interest assessed pursuant to the following acts or any regulations promulgated under the authority of the following acts [which includes listed code sections governing littering, dumping, consumer violations, car insurance laws, and parking / traffic violations].
>
> (2) Owes the District more than $100 in past due taxes . . . ; [or …]
>
> (7) Owes the District more than $100 in outstanding fines, penalties, or interest[.]

D.C. Code § 47-2862(a).

Thus, for individuals who owe more than $100 to the District, disqualification from obtaining or renewing a driver's license is automatic. The law's mandatory "shall not issue or reissue" directive provides no opportunity for any pre-denial (or post-denial) inquiry into a resident's ability to pay and imposes no requirement for a determination that the failure to pay is willful. D.C. residents too poor to pay their debts have no chance to obtain or renew a driver's license—not because of any willful refusal to pay, but rather because of their poverty.

Amending the Clean Hands Law in 2001 to include parking and traffic ticket debt was never about public safety. The D.C. Council's 2001 amendment came at a time when the District was working to prove its fiscal responsibility and end the reign of the Financial Control Board that Congress established in 1995. *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8 (1995). The Council's sole stated purpose in enacting the 2001 amendment was to generate additional revenue for the District. The Council report accompanying the amendment emphasized that 570,000 tickets dating back to 1979, and worth about $53 million, remained outstanding because D.C. motorists lacked a "compelling reason to respond to the notices of violations." D.C. COUNCIL COMM. ON PUB. WORKS AND THE ENV'T, Committee Report on Bill 13-828, at 5 (2000) (attached as Exhibit A). The report concluded that one way to address this backlog was to "condition[] the issuance of any District license or permit on the payment of outstanding fines owed to the District," including fines for parking and traffic violations. *Id.* at 5. The Council made no attempt to justify this expansion of the Clean Hands Law on public safety grounds. *Id.*

## II.      The Operation of the Clean Hands Law

The District of Columbia Government enforces the Clean Hands Law for driver's licenses through the Department of Motor Vehicles ("DMV") and the Office of Chief Financial Officer

("OCFO"). When a D.C. resident applies to the DMV to obtain or renew a driver's license, the DMV checks a database maintained within the OCFO to determine whether the resident owes more than $100 in fines, fees, or other debt to the District. *See* D.C. COUNCIL COMM. ON BUS. AND ECON. DEV., Report on Bill 24-0237, at 110 (2022) (attached as Exhibit B) (OCFO report describing current Clean Hands system). If the database reveals that the resident owes more than $100, then the resident's application transaction is automatically terminated, and the application is denied. *Id.*[2]

It does not take much to accrue over $100 in traffic or parking fines and fees in the District. This is especially true for D.C. residents who are financially unable to pay the originally imposed fine on time. The District assesses fines for traffic and parking infractions in amounts typically ranging between $50 and $150. For example, a driver may be assessed a $50 ticket for driving too slowly, 18 DCMR §§ 2200.10 2600, a $75 ticket for a broken taillight, 18 DCMR §§ 705.1, 2600, or a $100 ticket for parking in a loading zone, 18 DCMR §§ 2402.6, 2601.1, tailgating, 18 DCMR §§ 2201.9, 2600, or turning right at a "no turn on red" sign. 18 DCMR §§ 2203, 2204, 2600. Further, a driver may be assessed $100 for driving between 11 and 15 miles per hour in excess of the speed limit. This is significant because the District deploys automated traffic enforcement

---

[2] D.C.'s Clean Hands enforcement scheme defers automatic license disqualification in two—and only two—contexts: first, where an applicant owing over $100 has disputed the underlying ticket and thus has appealed "the basis for the alleged debt and the appeal is pending," D.C. Code § 47-2862(b); and second, where an applicant is in compliance with an authorized payment schedule agreed to by the District Government. D.C. Code § 47-2862(c). Payment plans, however, are available only under sharply limited terms that residents of limited means ordinarily cannot satisfy, *see* 18 DCMR § 3007.5 (payment plans available where "the resident pays at least 25% of the total amount of the outstanding debt at the time of service . . . and pays the remaining balance not more than six (6) months after the date of the initial payment"), and the consequences for failure to comply with a payment plan are draconian, *see* 18 DCMR § 3007.13 ("A person who has failed to successfully complete a deferred payment plan may not participate in another deferred payment plan.").

7

("ATE") cameras throughout the city, including in neighborhoods with high concentrations of residents who are poor. *See* D.C. Code § § 50-2209.01-05; John Harden, *D.C. Parking, Traffic Tickets Snowball into Financial Hardships*, WASH. POST (Aug. 6, 2021), https://www.washingtonpost.com/dc-md-va/2021/08/06/dc-traffic-parking-tickets-black-neighborhoods/.

D.C. law also adds steep fees for late payment, which make it exceptionally easy to accumulate a debt beyond the means of low-income residents. Failure to pay a ticket in 30 days, or 60 days for red light and speed camera tickets, results in a doubling of the fine amount. D.C. Code §§ 50-2301.05(a)(2), (d), & (d)(1). Thus, even several $25 parking tickets, when doubled, can quickly surpass the $100 threshold. Further, for failure to pay in 90 days, the DMV typically sends the fine to a collection agency, which imposes an additional 20% surcharge. *See Central Collection Unit*, OFF. OF THE CHIEF FIN. OFFICER, https://cfo.dc.gov/service/central-collection-unit. The District makes no inquiry into a person's ability to pay before either doubling a fine or sending a fine to collections agency and assessing the additional 20% surcharge.

D.C.'s fines and fees enforcement system has extracted substantial wealth from its residents compared to other jurisdictions in the country. An analysis of "the amount of 'fines and forfeits' as a proportion of each municipality's population … found that among cities with over 200,000 people, Washington was an outlier, generating $261 per person in fines and fees," and that D.C. was the highest in the nation in fines and fees per capita, "more than double New York City, the number two city in fines per person at $118." Dan Kopf and Justin Rohrich, *No US City Fines People Like Washington D.C.*, QUARTZ (Jan. 29, 2020), https://qz.com/1789851/no-us-city-fines-people-like-washington-dc.

This enforcement regime has a disproportionately harsh impact on D.C. residents with low or no income. Assume, for example, that D.C. Resident A and D.C. Resident B both receive a $75 ticket for driving with a broken taillight. Resident A has adequate resources and pays the ticket without additional adverse consequences. Resident B, by contrast, lacks the resources to pay and the ability to obtain those resources in a short period, and so their fine is doubled to $150 after 30 days and, after 90 days, sent to collections and increased to $180. In addition, under the Clean Hands Law, Resident B is disqualified from renewing their driver's license until the fine is paid, even though they do not have the ability to pay and may well continue to lack the ability to pay at the time of renewal. Thus, for the exact same violation, Resident A, who has the means to pay on time, will pay $75, while Resident B, who lacks such means, will owe $180 and will face a much higher barrier to renewing their driver's license. The only difference between these two people is Resident B's poverty.

This system has not only deprived thousands of D.C. residents of their driver's licenses because of their poverty, but also has done so in error. While D.C. law entitles recipients of parking and traffic tickets to request reconsideration of their tickets and authorizes recipients to appeal an adverse decision, D.C. Code §§ 50-2302.05 & 50-2302.06 (moving violations), 50-2303.05 & 50-2303.06 (parking violations), D.C. residents often learn of their tickets only after the short deadline for payment has passed. Notices of infractions are sent to D.C. residents at the address listed in the DMV's records. D.C. Code §§ 50-2302.05(f), 50-2303.05(d)(2). In some cases, residents who experience homelessness, or who move frequently for other reasons, or who otherwise do not receive notice due to DMV errors, remain unaware of tickets they have been issued for years. *See, e.g., Drivers try to fight back against decades old tickets issued by DC DMV* (May 20, 2015), FOX 5 (May 20, 2015), https://www.fox5dc.com/news/drivers-try-to-fight-back-against-decades-old-

tickets-issued-by-dc-dmv (residents seeking renewals at DMV "forced to pay thousands of dollars in old tickets that they never knew about"). In other cases, residents may not learn about their tickets until they receive notification by mail from debt collectors, to which the District transfers unpaid fines after 90 days. *See Central Collection Unit*, OFF. OF THE CHIEF FIN. OFFICER, https://cfo.dc.gov/service/central-collection-unit. And in yet other cases, residents sharing the same name as other drivers are wrongly identified as having parking or traffic debt, but do not learn of that debt—and the District's error—until the District denies them a new or renewed license under the Clean Hands Law. *See, e.g.*, Declaration of Anthony Q. Jones ("Jones Decl."), ¶¶ 4-12 (attached as Exhibit C) (D.C. resident detailing a six-month process required to get DMV to correct its initial requirement that he pay fines for tickets that had been issued to people with the same name who lived in different states and had different dates of birth).

### III.    The Harms the Clean Hands Law Inflicts on Plaintiffs, Other District Residents of Limited Means, and the General Public

Quantifying the precise number of D.C. residents deprived of the opportunity to obtain or renew a driver's license under the Clean Hands Law is difficult because the District does not collect data on the subject. A conservative estimate is that tens of thousands of D.C. residents are currently disqualified. That rough estimate is based on the fact that, as of the most recent available public data from 2019, D.C. residents had 175,869 unpaid fines and fees of $100 or more. Fiscal Year 2020 Budget and Financial Plan Questions, OFF. OF THE CHIEF FIN. OFFICER (April 12, 2019) (attached as Exhibit I). Even assuming an average ratio of three fines per resident, 58,623 residents are disqualified from obtaining a driver's license—a figure representing over 10% of the District's adult population (575,161) based on the 2020 census. *See* Ex. B, Committee Report on B24-0237, at 46 (Tzedek DC and Venable LLP, *Driving DC to Opportunity*, at 8 (2021)). The harms the Clean Hands Law inflicts on the thousands of D.C. residents unable to pay off their fines and fees are

extensive. Without a driver's license, it is more difficult to navigate the activities of daily living. It is harder to get to the grocery store, take kids to and from childcare, visit and care for elderly relatives, attend doctors' appointments, and travel to and from—and thus hold—a job. The Clean Hands Law thus does more than punish these residents for their poverty. It intensifies the instability of their daily lives.

As explained below, the harms Plaintiffs have suffered as a result of the Clean Hands Law are emblematic of the harms D.C residents of limited means have suffered generally under the statute. They also underscore the broader societal costs exacted by the Clean Hands Law. The District itself has recognized and attempted to alleviate the damage wrought by its wealth-based driver's license scheme twice in the past four years—first in 2018 by repealing the statute requiring the suspension of driver's licenses based on unpaid debt, and second, less than a week ago, , by the Council's passing a law that would prospectively repeal the provision of the Clean Hands Law challenged in this case.

### A. Ongoing Harms to Plaintiffs

**Evelyn Parham** is a 51 year-old Black Ward 7 District resident who has been automatically disqualified by the Clean Hands Law from renewing her D.C. driver's license due to unpaid debts stemming from an accident she did not cause. *See* Declaration of Evelyn E. Parham, ¶ 1 ("Parham Decl.") (attached as Exhibit D). On December 20, 2016, Ms. Parham damaged her car after she drove over a pothole on the Benning Road Bridge in Northeast. *Id.* ¶ 5. Ms. Parham had to pay for her car to be towed and, the next day, contacted the District's 311 number and requested compensation for her damages. *Id.* Although she was told that a reimbursement form would be sent to her, she needed to call D.C.'s Office of Risk Management on three separate occasions over the next two months to obtain it. *Id.* ¶¶ 5-6. Because of heavy snow that winter, Ms. Parham had trouble getting a mechanic to inspect and photograph her car,

as the form required. *Id.* ¶ 6. When she ultimately submitted her completed form in mid-June 2017, it was rejected because it was three days late. *Id.* Given the car's damage and Ms. Parham's limited means, the car sat idle outside of her home even after its inspection certificate and registration expired. *Id.* ¶ 7. Ms. Parham contacted staff at the Office of the Mayor, who assured her that that her car would not be ticketed. *Id.* Despite this, Ms. Parham's car was ticketed—repeatedly—for expired tags and inspection as it sat outside of her house. Eventually, it was towed. *Id.*

Ms. Parham's driver's license expired in April 2019, and she has not driven since. *Id.* ¶ 9. The DMV has informed her that she cannot renew her license until she pays $800 in outstanding debt, as well as a $120 reinstatement fee and a $44 license registration fee. *Id.* ¶ 4. Ms. Parham can no longer work; she has no pension; and she spends much of her day caring for an elderly parent she lives with. *Id.* ¶ 9. Ms. Parham now survives on $771 a month in SSI assistance and $238 a month in food stamp benefits. *Id.* ¶ 10. After paying for the necessities of daily living, she does not have enough money left to pay her outstanding fines and fees. Without a driver's license, Ms. Parham must pay other people to take her mother to medical appointments and other personal appointments. *Id.* ¶ 9. She also must pay relatives and friends to take her on personal errands, or run errands for her instead. *Id.* Ms. Parham could use a driver's license to personally take care of her mother and herself, but the Clean Hands Law puts these basic daily necessities out of reach.

**Nichole Jones** is a 48 year-old Black Ward 8 District resident who has been disqualified from renewing her D.C. driver's license because of unpaid parking and traffic tickets she is unable to afford to pay. Declaration of Nichole Jones, ¶ 1 ("Jones Decl.") (attached as Exhibit E). Currently a resident of the Harriet Tubman Women's Shelter in Southeast D.C., Ms. Jones is a graduate of the University of the District of Columbia and previously had a career in public service. *Id.* ¶¶ 1, 3. Ms. Jones has been unable to work since she was seriously injured in an accident in

2008. Already stressed from financial loans, the accident exacerbated Ms. Jones' financial insecuirty. *Id.* ¶ 5.

Ms. Jones has accumulated $2,884 in tickets. *Id.* ¶ 6. Initially, she had tickets for parking and minor moving violations. *Id.* When these tickets remained unpaid, her license was suspended without her knowledge. *Id.* In 2014, Ms. Jones was arrested and received additional tickets for driving on a suspended license. *Id.* She later incurred additional fines when two checks she wrote to pay off her debt bounced due to insufficient funds. *Id.*

Ms. Jones presently has no income and receives no government assistance. *Id.* ¶ 11. She cannot afford to pay her outstanding debt to the District and thus cannot renew her driver's license. *Id.* Although she has limited mobility because of a cyst on her foot, Ms. Jones regularly walks to get from place to place to the extent she can. *Id.* ¶ 9. With a driver's license, Ms. Jones would apply to drive for a rideshare service, or pursue work in an office job. *Id.* ¶ 12. Without her license, neither is possible for her. *Id.*

**Carlotta Mitchell** is a 70 year-old Black Ward 8 District resident, a college graduate, and a former elementary school teacher, civil servant, and business consultant. Declaration of Carlotta Mitchell, ¶ 1 ("Mitchell Decl.") (attached as Exhibit F). In 2009, Ms. Mitchell became unemployed and, eventually, homeless. *Id.* ¶ 2. She stayed periodically at the John L. Young Women's Shelter, the Nativity Shelter for Women, and the Open Door Shelter. *Id.* ¶ 4. Often, however, she slept in her car with her therapy dog. *Id.* During this period, Ms. Mitchell's car's registration expired, and she could not afford to renew it. *Id.*

As a result of parking tickets accumulated between 2012 and 2014, Ms. Mitchell owes $660 in debt to the District. Mitchell Dec. ¶ 5. All of her parking tickets arose from the expiration

of her vehicle's tags during her period of homelessness and residence in shelters. *Id.* None of her outstanding tickets are for speeding or other moving violations. *Id.*

Ms. Mitchell remains unemployed, and receives no pension. *Id.* ¶ 7. She currently gets $970 per month in Social Security, $40 a month in D.C.'s Low Income Home Energy Assistance Program, and approximately $200 a month in food stamp benefits. *Id.* Ms. Mitchell uses this money to feed and clothe herself and pay for other necessities. *Id.* She does not have disposable income to pay off her outstanding parking fines and fees so that she can renew her driver's license.

There are few grocery stores in Ms. Mitchell's Ward 8 neighborhood. *Id.* ¶ 6. Without a driver's license, Ms. Mitchell must rely on taxis, rideshare companies and, when feasible, Metro services to shop for food, and constantly navigate the delay, uncertainty, and financial ripple effect of these options on her life. *Id.* ¶ 7. Ms. Mitchell attests that "[n]ot having a license has created a lot of sadness and depression in my life." *Id.*

**Dominique Roberts** is a 35 year-old Black Ward 6 District resident and single mother of three children. She currently works as a nurse in the Intensive Care Unit at Washington Hospital Center. Declaration of Dominique Chantey Roberts, ¶¶ 1, 2 ("Roberts Decl.") (attached as Exhibit G). Ms. Roberts owes the District $1,200 in fines and fees stemming from four tickets: two for parking and two for moving violations when Ms. Roberts drove between 11 and 20 miles over the posted limit. *Id.* ¶ 3.

Ms. Roberts' driver's license expired in 2019, and because of the Clean Hands Law, cannot be renewed while her debt is outstanding. *Id.* ¶ 5. Although she is gainfully employed, Ms. Roberts receives no child support, so much of her income goes towards caring for her three school-age daughters and her aging mother who lives with her. *Id.* ¶ 7. Although she is currently paying off her debt little by little, Ms. Roberts cannot do so all at once or on the schedule demanded by the

District Government, and so remains barred from renewing her driver's license. Without the ability to drive, Ms. Roberts struggles to raise her three daughters and care for her mother. *Id.* ¶¶ 2, 7. Her youngest child is unable to participate in many extracurricular activities because Ms. Roberts cannot drive. *Id.* ¶ 5.

**Victor Hall** is a 59 year-old Black Ward 6 D.C. resident who served both as a reservist with the D.C. National Guard and in active duty as a sergeant with the Army. Declaration of Victor Alonzo Hall, ¶ 1 ("Hall Decl.") (attached as Exhibit H). Mr. Hall has a certificate in heating, ventilation and air conditioning (HVAC) maintenance and performed HVAC maintenance and repair work in the D.C. metropolitan area for many years. *Id.* ¶ 2.

In 2020, Mr. Hall was injured. While he receives regular physical therapy for his injuries at the VA Hospital and Washington Hospital Center, he has not worked since the injury. *Id.* He has no income. *Id.* He has no unemployment insurance. *Id.*

Mr. Hall's driver's license expired in 2013. According to the District, he currently has over $2,000 in unpaid fines and fees for tickets issued between 2010 and 2012. *Id.* ¶¶ 3, 7. Two of these tickets are for parking violations. One is for driving through a red light. The other two are speed camera tickets that were issued when his vehicle was being driven by someone else. *Id.* ¶ 3. Last year, Mr. Hall received a letter from the District's collection agency offering to resolve his debt for $999. *Id.* He was unable to pay this amount and remains unable to pay it today. *Id.*

Mr. Hall faces daily hardships because of the Clean Hands Law, relying on friends or expensive rideshare services for rides to his medical and physical therapy appointments. *Id.* ¶¶ 4, 6. If he had a driver's license, he would be able to actively look for work, visit family on a regular basis, and attend his appointments consistently without relying on or having to pay for others to take him. *Id.* ¶¶ 5, 7.

### B. Broader Societal Harms

Beyond the burdens the Clean Hands Law imposes on Plaintiffs and other D.C. residents of limited means, the law exacts significant societal costs.

***Exacerbates racial inequality***. The harms inflicted by the Clean Hands Law fall disproportionately on Black D.C. residents. The D.C. Council's Office of Racial Equity, after analysis, concluded that ending the application of the Clean Hands Law to driver's licenses "will likely improve the quality of life incomes for Black residents who have a debt to the District government." Ex. B, Committee Report on B24-0237, at 115. The Office of Racial Equity noted that: "Fines criminalize poverty and reinforce the Black-white racial wealth gap. The District's fees and fines landscape not only impacts Black residents in terms of enforcement, but also by reinforcing the systems that maintain the racial wealth gap. This is because the same fines and fees are more of a financial burden for those with less income and wealth. Consider that in 2019, Black households in the District made up seventy five percent of households that earned less than $10,000 dollars per year. . . . Ultimately, fines and the enforcement of them within the current economic landscape in the District serve as a regressive tax that criminalizes people, especially Black residents, for being poor." *Id.* at 116.

Further, while the median white D.C. household has 81 times more wealth than the median Black D.C. household, Black drivers in D.C. are nearly four times more likely than white drivers to receive traffic tickets. *See id.* at 50, 70, and 71 (*Driving DC to Opportunity* detailing D.C. MPD data). This disparity in the issuance of tickets—in a city where Black residents make up less than half the population—exists for both traffic stops and automated traffic tickets. *See* Harden, *D.C. Parking, Traffic Tickets Snowball into Financial Hardships*, ("D.C. police issued more than $3.2 million in traffic infraction tickets to Black motorists from March 2020 through June 2021. For White motorists, it was $569,700"); *see also id.* ("Last year, [D.C.]'s automated systems . . . issued

more than $110 million in tickets in neighborhoods where Black residents made up 70 percent of the population, and $24 million where the residents were mostly White."); William Farrell, *Predominately black neighborhoods in D.C. bear the brunt of automated traffic enforcement*, D.C. POL'Y CTR. (June 28, 2018), https://www.dcpolicycenter.org/publications/predominately-black-neighborhoods-in-d-c-bear-the-brunt-of-automated-traffic-enforcement (". . . the racial geography of D.C. does play into in the enforcement of traffic violations: census tracts with higher proportions of black residents are associated with a higher incidence of traffic fines, despite not experiencing a greater number of crashes").

The upshot is that Black D.C. residents are more likely to be ticketed than white residents, yet less likely to have the resources to pay the corresponding fines. Under the Clean Hands Law, Black D.C. residents are thus disproportionately more likely to lose their ability to obtain or renew a driver's license and suffer the accompanying, destabilizing harms.

**Harms D.C. residents with disabilities.** In 2018, more than 60% of adults with disabilities reported that they drive a car. *See* Stephen Brumbaugh, *Travel Patterns of American Adults with Disabilities*, U.S. Dep't. of Transp. at 4 (Sept. 2018), https://www.bts.gov/sites/bts.dot.gov/files/2022-01/travel-patterns-american-adults-disabilities-updated-01-03-22.pdf. Yet adults with disabilities are more than twice as likely to experience poverty as adults without disabilities. *See* Nanette Goodman et al., *Financial Inequality: Disability, Race and Poverty in America*, NAT'L DISABILITY INST., at 12 (Feb. 2019), https://www.nationaldisabilityinstitute.org/wp-content/uploads/2019/02/disability-race-poverty-in-america.pdf. Many disabled persons are on public assistance and have few assets, making it difficult to save for a financial emergency. *See* Azza Altriraifi, *A Deadly Poverty Trap: Asset Limits in the Time of Coronavirus*, CTR. FOR AM. PROGRESS (Apr. 7, 2020),

americanprogress.org/issues/disability/news/2020/04/07/482736/deadly-poverty-trap-asset-limits-time-coronavirus/. Individuals with disabilities are thus at increased risk of being ensnared by the Clean Hands Law.

The impact on such individuals could be even harsher than for those without disabilities. While traveling a mile to a bus or Metro station may be feasible for an individual without disabilities, it is often infeasible for an individual with disabilities. The Clean Hands Law had precisely such an impact on several Plaintiffs who are disabled. Nichole Jones, for example, attests that "[w]alking has done significant wear and tear on my legs and led to a painful cyst on the muscles in my left foot because I have no other means to get around," and that if she had a driver's license, she "would be able to get around the city without risking damaging [her] body further." Ex. E, Jones Decl. ¶¶ 5, 9, 12.

*Harms job and income prospects for District residents*. Loss of a driver's license makes it harder for District residents to find and keep a job, and for District residents who lose their job due to the loss of a license, the inability to drive might make it harder to find a new job that pays as well. Not only do workers with driver's licenses receive a wage premium relative to unlicensed workers, they also enjoy longer job tenure, lower voluntary and involuntary part-time status, and lower unemployment rates than their unlicensed counterparts. *See* Ryan Nunn, *How Occupational Licensing Matters for Wages and Careers*, BROOKINGS INSTITUTION (March 15, 2018), https://www.brookings.edu/research/how-occupational-licensing-matters-for-wages-and-careers/. In a survey of New Jersey drivers whose licenses were suspended, 64% of low-income drivers reported that they were unable to keep their job after they lost the ability to drive lawfully, and 51% of low-income drivers who lost their job were unable to find a new job. *See* Jon A. Carnegie & Alan M. Vorhees, Driver's License Suspensions, Impacts and Fairness Study, RUTGERS , at 55,

57 tbl.25 (August 2007), https://www.nj.gov/transportation/business/research/reports/FHWA-NJ-2007-020-V1.pdf; CPI Inflation Calculator, U.S. Bureau of Lab. Stats., bls.gov/data/inflation_calculator.htm.

In the D.C. metropolitan area, having the ability to drive to work is often vital to maintaining remunerative employment. Approximately one in three jobs is accessible via public transit within 90 minutes, fewer than one in five jobs is accessible within 60 minutes, and fewer than one in ten jobs is accessible within 45 minutes. *See* Adie Tomer et al., *Missed Opportunity: Transit and Jobs in Metropolitan America*, Brookings Institution, at 16 tbl.3, 46 app. 5 (May 2011), brookings.edu/wp-content/uploads/2016/06/0512_jobs_transit.pdf. By necessity, driving remains the most common way for D.C. residents to commute to their jobs. Not having a driver's license severely limits both job opportunities and job maintenance prospects. As D.C. Council Labor and Employment Committee Chair Elissa Silverman recently noted in connection with the Clean Hands Law: "Not everybody has [the] ability [to pay], and it ends up being an obstacle to getting a driver's license that can have severe consequences. District residents have lost their jobs over this issue." D.C. Committee of the Whole, *Thirtieth Additional Legislative Session*, at 38:36 (May 24, 2022) http://dc.granicus.com/MediaPlayer.php?view_id=3&clip_id=7480.

***Harms employers.*** When an employee loses a job because they can no longer drive, their employer must hire and train a new employee and might have to pay unemployment insurance. *See, e.g.,* Alex Bender et al., *Not Just a Ferguson Problem: How Traffic Courts Drive Inequality in California*, Lawyers Committee for Civil rights of the San Francisco Bay Area, at 7 (2015), https://lccrsf.org/wp-content/uploads/2021/05/Not-Just-a-Ferguson-Problem-How-Traffic-Courts-Drive-Inequality-in-California-2015.pdf. In acknowledgment of such consequences, the U.S. Chamber of Commerce and major U.S. financial institutions have called

for abolishing laws like the Clean Hands Law. For example, in a July 26, 2021 letter to Congress, CEOs for Racial Action sought to encourage reform, maintaining that, "[w]ithin businesses, debt-based license suspensions contribute to employee turnover, absenteeism, and increased recruiting . . . ." Letter from CEO Action for Racial Equality to Senators Dick Durbin and Chuck Grassley (July 26, 2021), https://www.ceoaction.com/media/press-releases/2021/letter-to-congress-supporting-the-driving-for-opportunity-act/.

*Needlessly exposes D.C. residents to criminal punishment and diverts law enforcement resources*. In D.C., driving without a valid driver's license is a criminal misdemeanor punishable by up to a year in jail and a fine of up to $2,500. D.C. Code § 50-1403.01(e); *see also id.* § 22-3571.01(b)(5). Yet because driving is vital for navigating daily life, many people continue to drive without a license despite the risk of arrest and conviction. Of the nearly 30,000 arrests for traffic violations made by the D.C. Metropolitan Police Department ("MPD") between January 2013 and November 2020, driving without a license was the most serious offense the motorist was arrested for nearly 80% of the time. *See* Ex. B, Committee Report on B24-0237, at 51, 62, 63; (*Driving DC to Opportunity* citing and collecting MPD open source data on adult arrests for 2013-2020). Given that driving without a license is not inherently dangerous, this is a staggeringly high rate. But it is consistent with historic national survey data, which indicated that approximately three-fourths of drivers who used to have a valid license, but no longer do, drive at least occasionally. *See* National Cooperative Highway Research Program, *Report 500 – Volume 2: A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers with Suspended or Revoked Licenses*, NATIONAL ACADEMIES, TRANSPORTATION RESEARCH BOARD, at I-1 – I-2 (2003), https://trb.org/publications/nchrp/nchrp_rpt_500v2.pdf; Driving for Opportunity Act of 2020, H.R. 8881, 116th Cong. § 2(19) (2020).

By expanding the pool of residents at risk of arrest for driving without a valid license, the Clean Hands Law diverts the District's finite public safety resources from addressing serious crime, including violent crime, as well as dangerous traffic offenses. In 2019 alone, Metropolitan Police Department officers made 2,797 adult arrests for which the most serious offense was driving without a license. Even excluding time spent processing paperwork, completing the traffic stops in these cases consumed 932 hours (38.8 days) of police time. Ex. B, Committee Report on B24-0237, at 53, 71 (*Driving DC to Opportunity* collecting and anlyzing MPD open source data on adult arrests for 2013-2020)*; see also See* U.S. Dept. of Justice, Statement of Interest, *Stinnie*, No. 3:16-cv-00044-NKM-JCH, (ECF No. 27)("research shows that suspending driver's licenses for nonpayment of fines and fees actually undermines public safety by diverting law enforcement resources away from traffic violations that do pose a risk to the public and by leading to more unlicensed and uninsured drivers on the roads"); *id.* at n.5 (collecting research).

### C. The District's Recent Legislative Recognition of the Harms that Its Wealth-Based Driver's License Scheme Inflicts on District Residents

On two different occasions in the past several years, the D.C. Council has considered and enacted legislation that recognizes and seeks to remedy the deleterious impact of depriving indigent District residents of driver's licenses as punishment for their inability to pay parking and traffic fines and fees.

In 2018, the Council took an initial step to rectify the problem by ending the automatic *suspension* of driver's licenses based on non-payment of parking and traffic debt, and required the DMV to restore all licenses suspended solely on that basis. *See* Traffic and Parking Ticket Penalty Amendment Act of 2018, D.C. Law 22-175, § 2 (effective Oct. 30, 2018), amendment codified at D.C. Code § 50-2301.01, *et seq.* In connection with that bill's passage, the Council's lead sponsor noted that the objective of the legislation was to stop penalizing indigent D.C residents for their

poverty: "Suspending the licenses of low-income residents for inability to pay tickets ends up punishing people for being poor, … . Nearly half of all license suspensions lead to job loss, which makes it even harder to pay debt that made you lose your driving privileges in the first place." Elissa Silverman, *Silverman Bill Ending License Suspensions for Unpaid Tickets Passes Unanimously* (July 13, 2018), https://www.elissasilverman.com/silverman_bill_ending_license_suspensions_for_unpaid_ticket s_passes_unanimously. Once the 2018 law went into effect, the DMV restored the licenses of 15,521 D.C. residents. *See* D.C. Dep't of Motor Vehicles, *DC DMV Communication Related to Reinstating Suspended Driver Licenses and Driving Privileges* (Dec. 10, 2018), at 57, https://dccouncil.us/wp-content/uploads/2019/02/dmv19.pdf.

   Although the non-renewal of a driver's license under the Clean Hands Law functions, in effect, as a slow-motion suspension, the Council did not repeal the Clean Hands Law's non-renewal provision—*i.e.,* the provision challenged in this case—in 2018. Earlier this month, however, it did so. And in doing so, the Council was again animated by the desire to stop punishing poor people for their poverty.

   This objective was evident from the beginning. In April 2021, the Council received from more than 30 civil rights, anti-poverty, legal services, and faith-based groups a letter identifying the "urgent" need for reform of the current version of the Clean Hands Law. The letter attached a detailed report explaining why the current version is both bad public policy and unconstitutional, and drew on both extensive supporting data and the experiences of residents directly affected by the law.[3] The letter and accompanying report prompted the introduction of the Clean Hands Equity

---

[3] *See* Ex. B, Committee Report on B24-0237, at 35-89 (including *Driving DC to Opportunity*).

Certification Amendment Act of 2021, DC B24-0237 (2021), as well as a companion bill that sought to address the same concerns.[4] The Council's Committee on Business and Economic Development conducted a full legislative hearing at which these concerns were aired.[5]

Based on input from executive branch agencies, the Council was able to identify the funding purportedly needed to eliminate the driver's license non-renewal provision of the Clean Hands Law, but on a delayed basis. In May and June 2022, the Council passed two budget bills with provisions that, in combination, provide the necessary funding beginning in Fiscal Year 2024, which starts on October 1, 2023.[6]

---

[4] *See DC Driving to Opportunity Amendment Act of 2021*, DC B24-0230 (2021). The substantive provisions of this bill were ultimately folded into the renamed *Clean Hands Certification Equity Amendment Act of 2022*, DC B24-0237 (2021).

[5] *See* Ex. B, Committee Report on B24-0237; *see also* D.C. COUNCIL COMM. ON BUSS. AND ECON. DEV., *Report and Recommendations of the Committee on Business and Economic Development on the Fiscal Year 2023 Budget for Agencies Under Its Purview*, at 111-12 (April 21, 2022), https://dccouncil.us/wp-content/uploads/2022/04/DRAFT-FY23-CBED-Budget-Report.pdf.

[6] *See* Amendment (Mendelson) to Fiscal Year 2023 Local Budget Act of 2022, DC B24-0716 (Amendment #1 to "(a) Increase . . . by $310,000 in one-time local funds in FY 2023. Rationale: . . . The DMV one-time enhancement funds information technology system improvements needed to conform to Bill 24-237 . . . [T]here will be an additional amendment made to the FY 2023 Budget Support Act of 2022 . . . to ensure that the budget and financial plan remain balanced"); Fiscal Year 2023 Budget Support Act of 2022, DC B24-0714 (2021), Section 7162 ("If Fiscal Year 2024, 2025, and 2026 local revenues certified in the September 2022 or December 2022 revenue estimates exceed the revenue estimate incorporated in the Fiscal Year 2023 approved budget and financial plan by at least $2.419 million each year, $2.419 million shall be allocated to offset the fiscal impact of revenue loss attributable to the Clean Hands Certification Equity Amendment Act of 2021 . . . provided, that it remains possible for the Clean Hands Act to receive two readings by December                                           31,                                        2022"), https://lims.dccouncil.us/downloads/LIMS/49081/Meeting3/Amendment/B24-0716-Amendment4.pdf. The two required readings have now occurred, and the fiscal certification contingency required for the bill to take effect by Fiscal Year 2024 appears very likely to occur, as the District's Chief Financial Office recently announced that "revenue for Fiscal Year 2022 has been revised upward by $490.6 million." Letter from Fitrzroy Lee, Chief Financial Officer of the District of Columbia to Muriel Bowser, Mayor of the District of Columbia, and Phil Mendelson, Chairman    of    the    Council    of    the    District    of    Columbia    (June    30,    2022), https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/JUNE_2022_Revenue%20Letter%20Final.pdf.

23

Following the passage of these budget bills, the Business and Economic Development Committee marked up the Clean Hands Certification Equit Amendment Act of 2022, voted on it, and discharged it to the full Council. After defeating a proposed amendment, the Council voted unanimously, 13-0, to enact it. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, *Voting Information for B24-0237*, https://lims.dccouncil.us/Legislation/B24-0237. If the legislation becomes law following Home Rule Act review by the Mayor and Congress, *see* D.C. Code § 201.01, *et seq.*, the Clean Hands Law will no longer automatically disqualify individuals with unpaid fines and fees from obtaining or renewing a driver's license.[7] Consistent with the conditions established in the budget bills, the repeal will become effective "[b]eginning on October 1, 2023." *Clean Hands Certification Equity Amendment Act of 2022*, DC B24-0237 (2021).

During the legislative process, the Council repeatedly invoked the harms the Clean Hands Law inflicts on District residents of limited means as the justification for the legislation. For instance, the Business and Economic Development Committee, as noted, adopted the analysis of the Council's Office of Racial Equity, which concluded that the "challenges" presented by the Clean Hands Law:

> make it more difficult for lower-income and people of color to obtain quality jobs or housing and inhibit their ability to withstand future financial challenges and shocks. Because this measure would improve the chances of communities most impacted by the current law, which prevents them from obtaining and/or renewing their driver's licenses, to remain employed and financially solvent, CORE concludes that the measure would likely improve quality of life outcomes for Black District residents.

---

[7] *See* COUNCIL OF THE DISTRICT OF COLUMBIA, *Clean Hands Certification Equity Amendment Act of 2022, Engrossed Version, https://lims.dccouncil.us/downloads/LIMS/47106/Meeting1/Enrollment/B24-0237-Enrollment1.pdf* (text of the Act as passed removing from definition of license for Clean Hands law purposes "any operator's permit or identification card issued pursuant to" designated sections related to driver's license and other identification cards issuance).

24

Ex. B, Committee Report on B24-0237, at 7. Similarly, Councilmember Pinto "noted that it is remarkable how broad and far-reaching the consequences of not being able to pay one's traffic tickets impact a resident's life, health, and livelihood. Accordingly, she stated that "the Council needs to support residents in precarious situations highlighted in the testimonies the Committee received during the public hearing on this measure." *Id.* at 8. Those testimonies, which were extensive, echoed the 30-group letter and attached report that the Council received in April 2021, at the beginning of the legislative process. *See, e.g.*, *id.* at 92 (recounting ACLU-DC testimony); 106 (recounting Jews United for Justice testimony); 100 (recounting DC Fiscal Policy Institute testimony).

## IV.     The Failure of the Clean Hands Law to Achieve Its Intended Purpose

The harms the Clean Hands Law inflicts on indigent District residents by depriving them of driver's licenses are not justified by the statute's ostensible objective of generating revenue for the District from the payment of fines and fees. There is no evidence that withholding a driver's license from someone too poor to pay their debts to the District will somehow incentivize them to come up with money they do not have. To the contrary, the Clean Hands Law makes it more difficult for D.C. residents in poverty to come up with the money. Without a driver's license, residents in poverty find it harder to maintain remunerative work. Without remunerative work, they cannot earn the income they need to pay what they owe and cannot otherwise flourish. The Clean Hands Law thus makes it harder, not easier, for the District to collect its debts from D.C. residents in poverty.

The Clean Hands Law also does little or nothing to encourage payment from others who owe money to the District. At least 85% of outstanding traffic and parking fines and penalties are owed by non-D.C. residents. Luz Lazo, *Maryland and Virginia Drivers Owe D.C. More than $370*

*Million in Outstanding Traffic and Parking Fines*, WASH. POST (Oct. 4, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-and-virginia-drivers-owe-dc-more-than-370-million-in-outstanding-traffic-and-parking-fines/2020/10/04/c11a1df6-030c-11eb-b7ed-141dd88560ea_story.html. These individuals do not have D.C. driver's licenses, so the threat of non-renewal of a D.C. driver's license under the Clean Hands Law does not incentivize them to pay their debts to the District. Moreover, District residents who *can* afford to pay their debts to the District have strong incentives to pay apart from the Clean Hands Law's prohibition on driver's license renewal. These include not only the psychic benefits of paying off debt, but also (i) avoiding the hassle of dealing with debt collection agencies; (ii) avoiding flags on specialty credit reports or other public records often checked by landlords and employers; (iii) avoiding the withholding of D.C. tax refunds; and (iv) retaining the ability to obtain professional and business licenses and permits that, like driver's licenses, currently require a "Clean Hands" review by the D.C. Government. *See* Ex. B, Committee Report on B24-0237, at 59 & 77-78 nn. 129-31 (detailing these incentives).

The Clean Hands Law thus does not incentivize payment of parking and traffic debt by non-D.C. residents, who owe the vast majority of such debt, or by D.C. residents who can afford to pay such debt. And the statute makes it harder for D.C. residents who are too poor to pay, including Plaintiffs, to come up with the money to pay.

Policymakers, academic studies, and courts have recognized the inability of laws like the Clean Hands Law to accomplish their payment-coercion objective:

- One study by the American Association of Motor Vehicle Administrators, a consortium of law enforcement agencies, concluded: "The common belief that a driver['s] license suspension provides effective, sustainable motivation to encourage individuals to

comply with court ordered or legislated mandates to avoid suspension is not supported

by empirical evidence." *Best Practice Guide to Reducing Suspended Drivers*,

AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINSTRATORS, at 6 (2013),

https://www.justice4all.org/wp-

content/uploads/2015/02/SuspendedRevokedBestPracticeGuide.pdf.

- In 2017, in a signing statement explaining his support for a reform of a California law

    that automatically suspended driver's licenses for unpaid fines, then-Governor Jerry

    Brown observed: "There does not appear to be a strong connection between suspending

    someone's driver[']s license and collecting their fine or penalty. Often, the primary

    consequence of a driver[']s license suspension is the inability to legally drive to work

    or take one's children to school." *2017-18 Governor's Budget Summary*, STATE OF

    CALIFORNIA, at 84 (Jan. 10, 2017), https://www.ebudget.ca.gov/2017-

    18/pdf/BudgetSummary/FullBudgetSummary.pdf.

- The City of Dallas, Texas, like the District, uses a computer program that automatically

    places a hold on a driver's license when someone fails to pay a fine or fee. The

    neighboring City of Fort Worth, Texas does not use such a program. Yet Fort Worth

    collects more per case ($116) than Dallas ($113). *Reducing Harm and Incrasing*

    *Accountability: Court Debt Collection Examples* (2020),

    https://olis.oregonlegislature.gov/liz/2020R1/Downloads/CommitteeMeetingDocume

    nt/214768.

- In a decision ruling that Virginia's now-repealed law suspending driver's licenses for

    unpaid debts was likely unconstitutional, the U.S. District Court for the Western

    District of Virginia found that the evidence it had heard on a motion for preliminary

27

injunction (similar to this one) showed "[t]here is no indication that a loss of [a] license will incentivize individuals to pay court fines and costs where those individuals simply cannot afford to pay." The court continued: "In practice, the loss of a driver's license adversely affects people's ability to gain and maintain employment, often resulting in a reduction of income. This deprives individuals of means to pay their court debt, *hindering* the fiscal interests of the government." *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 531 (W.D. Va. 2018) (emphasis added).

- In a Statement of Interest in the same case, the United States Department of Justice explained that "automatic driver's license suspensions do not further the [government]'s interest in ensuring compliance with court orders—particularly with respect to indigent defendants, who remain unable to pay court-ordered fines and fees after their driver's license suspension and may become less able to pay in light of the adverse impact of the suspension on their employment and their lives." U.S. DEPT. OF JUSTICE, Statement of Interest, *Stinnie*, No. 3:16-cv-00044-NKM-JCH, (ECF No. 27).

Laws like the Clean Hands Law are not only ineffectual and counterproductive, but also inferior to other methods of securing debt repayment from people of limited means. Empirical evidence suggests that tailoring debt from fines and fees to debtors' ability to pay is more effective at obtaining repayment than punishing debtors for failing to pay a traditional, fixed amount. For example, an Iowa county recently found that when it decreased civil fines by an average of $40 based on ability to pay, the average amount collected jumped by more than $160, from $197 to $360. Beth Colgan, *Graduating Economic Sanctions According to Ability to Pay*, 103 Iowa Law Review 53, 67 (2017). Similarly, a recent review of data in Maricopa County, Arizona found that, within a specified range for each offense, criminal defendants sentenced to fines adjusted for

28

income paid nearly twice as much as defendants sentenced to traditional, non-income-adjusted fines. This was so even though the defendants sentenced to income-adjusted fines generally received lower fines. *Id.* Moreover, the defendants sentenced to income-adjusted fines paid at least something toward their fines at a rate 19% higher than the defendants sentenced to non-income-adjusted fines (96% vs. 77%) and were also far more likely to pay their fines in full within a year (52.7% vs. 20.3%). *Id.*

## ARGUMENT

On a motion for preliminary injunction, this Court must consider four factors: "(1) whether there is a substantial likelihood that the movants will prevail on the merits; (2) whether they are in danger of suffering irreparable harm during the pendency of the action if the injunction is not granted; (3) whether the balance of the equities is in their favor; and (4) whether the public interest would be disserved by the issuance of an injunction." *District of Columbia v. Reid*, 104 A.3d 859, 865 (D.C. 2014) (citing *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C. 1976)). "[A] likelihood of success on the merits" means a "'substantial likelihood' though not a 'mathematical probability,' and does not express a fixed measurement, as it is part of a multi-factor test where a stronger showing on some factors can compensate for a weaker showing on others." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1234 (D.C. 2016), *as amended* (Dec. 13, 2018) (internal citations omitted); *see also Jeffers v. United States*, 208 A.3d 357, 360-61 (D.C. 2019) (same).

In deciding Plaintiffs' Motion, this Court may consider not only Plaintiffs' sworn declarations, but also the content of the pertinent news articles, studies, reports, District legislative records, and D.C. Government websites cited above. "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *compare* D.C. Super.

Ct. R. Civ. P. 56 (requiring that a declaration used to support or oppose summary judgment motions "must be made on personal knowledge [and] set out facts that would be admissible in evidence") *with* D.C. R. Civ. P. 65 (providing no such requirement for preliminary injunction motions). Accordingly, "for the limited purpose of determining whether to award a preliminary injunction," this Court may "rely on hearsay evidence." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *see also Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding.") (citation and internal quotations omitted).

Based on the evidence Plaintiffs offer here, as well as the evidence they will offer at any hearing, each of the four factors governing the issuance of a preliminary injunction strongly favors them. An evaluation of these factors in combination compels an order granting their Motion.

## I.      There Is a Substantial Likelihood Plaintiffs Will Prevail on Counts I and II.

Because the District of Columbia "is a political entity created by the federal government, it is subject to the restrictions of the Fifth Amendment, not the Fourteenth." *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). The due process and equal protection guarantees of the two amendments are, however, the same: the Fifth Amendment protects in the District of Columbia what the Equal Protection and Due Process Clauses of the Fourteenth Amendment protect in the States. *Id.*

In this case, Plaintiffs are suing the District and two of its officials for Fifth Amendment violations identical to what would be Fourteenth Amendment violations if committed by a State and its officials. Based on long-established precedent under the Fourteenth Amendment, there is a

substantial likelihood that Plaintiffs will succeed on at least Counts I and II of the Complaint, both of which assert Fifth Amendment claims.[8] Count I contends that Defendants have violated Plaintiffs' procedural due process rights by failing to provide them with an opportunity for a hearing before disqualifying them from renewing their driver's licenses on the ground that they owe the District more than $100. Count II contends that Defendants have violated the "convergence" of equal protection and due process guarantees by automatically disqualifying plaintiffs from renewing their driver's licenses without first establishing that the nonpayment of their government debts has been willful and not a consequence of their inability to pay.

### A. Defendants have violated Plaintiffs' procedural due process rights by failing to provide them the opportunity for a hearing before depriving them of driver's licenses based on debt owed to the District.

A driver's license is a property interest protected by the Constitution's procedural due process guarantee. *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Quick v. Dep't of Motor Vehicles*, 331 A.2d 319, 321 (D.C. 1975); *Zorgani v. District of Columbia*, Civ. Action No. 17-2360 (EGS), 2022 WL 1491133, at *7 (D.D.C. May 5, 2022). Defendants thus may not refuse to renew (or suspend) a driver's license without affording the license holder fair notice of the impending deprivation and a meaningful opportunity to challenge it before it takes effect. *Mullane v. Cent.*

---

[8] For the sake of streamlining the Court's resolution of this motion for preliminary injunction, Plaintiffs focus here on Counts I and II of the Complaint. Plaintiffs are prepared to fully substantiate the other two Fifth Amendment claims in this litigation. Count III contends that the Clean Hands Law violates equal protection guarantees because it disqualifies Plaintiffs from renewing their driver's licenses as a penalty for owing money to the District, with no indigency exception and no protection for funds needed to subsist, which stands in contrast to the protections afforded D.C. residents who owe money to private parties for civil judgments. *See James v. Strange*, 407 U.S. 128 (1972). Count IV contends that enforcing the Clean Hands Law against Plaintiffs violates substantive due process because depriving them of the ability to obtain or renew a driver's license based on the nonpayment of parking and traffic debts does not achieve, cannot plausibly achieve, and thus is not rationally related to, the statute's objective of coercing them to pay their debts to generate revenue for the District.

31

*Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950); *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976).

Here, for the purpose of obtaining a preliminary injunction, Plaintiffs focus on the second requirement of procedural due process—the requirement to provide an opportunity to challenge the deprivation of a property interest.[9] "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Mathews,* 424 U.S. at 333. "A meaningful hearing serves the Due Process Clause's purpose of protecting persons 'from the mistaken or unjustified deprivation of life, liberty, or property.'" *Stinnie v. Holcomb,* 355 F. Supp. 3d 514, 529 (W.D.Va. 2018) (*citing Carey v. Piphus*, 435 U.S. 247, 259 (1978)) (preliminarily enjoining enforcement of Virginia law requiring automatic suspension of driver's licenses as punishment for unpaid fines and fee debts).

Defendants have not provided Plaintiffs the meaningful opportunity to challenge the non-renewal of their driver's licenses that procedural due process requires. The Supreme Court firmly established this requirement 50 years ago in *Bell v. Burson*. Analysis of Defendants' enforcement of the Clean Hands Law under the Court's subsequently articulated due process test in *Mathews v. Eldridge*—which determines whether the government has afforded an adequate hearing regarding the deprivation of a property interest—reinforces what *Bell* held. Plaintiffs are thus likely to succeed on the merits of Count I.

---

[9] Plaintiffs also contend that, under the Clean Hands Law, Defendants have failed to comply with the first requirement of procedural due process—notice of the impending deprivation of their driver's licenses. That is, they contend that Defendants did not provide them with notice "reasonably calculated, under all the circumstances, to apprise [them] of the pendency of the [nonrenewal] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 315 (1950); *Stinnie*, 355 F. Supp. 3d at 528 (citing *Mullane*). Although Plaintiffs are not making this particular argument in seeking a preliminary injunction, they will press it and further develop the supporting facts as the litigation progresses.

    **1. Supreme Court precedent firmly establishes that Defendants' failure to provide Plaintiffs any hearing *at all* before disqualifying them from renewing their driver's licenses violates their procedural due process rights.**

    More than 50 years ago—even before establishing in *Mathews v. Eldridge* the now-familiar three-factor balancing test for determining the adequacy of a hearing opportunity—the Supreme Court determined that, except in "emergency situations" that implicate public safety, procedural due process obligates the government to provide driver's license holders an opportunity for a hearing ***before*** taking their licenses away. In *Bell*, the Court recognized that "due process requires that when a State seeks to terminate an interest such as that here involved [*i.e.,* a driver's license], it must afford 'notice and opportunity for hearing appropriate to the nature of the case' ***before the termination becomes effective.***" *Bell,* 402 U.S. at 242 (emphasis added) (citations omitted). The District of Columbia Court of Appeals relied on and explicitly followed *Bell* several years later, recognizing that "[b]ecause the privilege . . . to drive was placed in issue by the order to show cause why his license should not be suspended . . . procedural due process requires that a hearing be held *prior to* permanent suspension." *Quick,* 331 A.2d at 321 (emphasis added).

    As enforced against Plaintiffs, the Clean Hands Law should meet the same fate as the law invalidated in *Bell.* Under the Clean Hands Law, Defendants did not offer Plaintiffs *any* opportunity to be heard, much less a meaningful one, before disqualifying them from applying to retain their licenses based on their debts to the District. The disqualification was automatic. Deprived of their licenses solely because of their failure to pay, and not because their driving poses a public safety "emergency," Plaintiffs had no chance to contest the nonrenewal of their licenses "before the termination bec[a]me[] effective." *Bell,* 402 U.S. at 542. They had no "opportunity to be heard regarding their default," and no "opportunity to present evidence that they are unable to

satisfy [their] debt [to the District]." *Stinnie*, 355 F. Supp. 3d at 531 (applying *Bell*, 402 U.S. at 542). Defendants thus denied Plaintiffs the process they were due under the Fifth Amendment.

>    **2.    Applying the *Mathews v. Eldridge* factors to the District's enforcement of the Clean Hands Law confirms that Defendants are violating Plaintiffs' procedural due process rights.**

Decided five years after *Bell*, *Mathews* requires that, in determining whether the government has provided a meaningful opportunity to be heard regarding the deprivation of a protected property interest, a court must weigh: (1) the nature of the private interest affected; (2) the risk of erroneous deprivation and the probable value of additional safeguards; and (3) the government's interest. *Mathews*, 424 U.S. at 335.[10] In this case, consideration of these three factors confirms what *Bell* otherwise dictates: Defendants' failure to give Plaintiffs any hearing at all before disqualifying them from renewing their drivers' licenses violates procedural due process.

That was the result in a recent case with similar facts in federal court in Virginia. In that case, *Stinnie v. Holcomb*, the court, applying both *Bell* and the *Mathews* factors, preliminarily enjoined operation of a Virginia law that required the automatic suspension of driver's licenses for failure to pay state court fines and costs. The court in *Stinnie* explained that the constitutional flaw in Virginia's law was that it prescribed automatic suspension of driver's licenses without providing license holders who owed court debts "any opportunity to be heard regarding their default, nor …

---

[10] *Matthews* is consistent with *Bell*, and in no way departs from *Bell*'s application of procedural due process principles to the deprivation of driver's licenses, which was at issue in *Bell* and not in *Matthews*. In fact, the Court utilized a similar analytical framework in both cases. *Compare Bell*, 402 U.S. at 539-40 (weighing individual interest, sufficiency of existing process, and government interest), *with Mathews*, 424 U.S. at 335 (instructing courts to consider individual interest, risk of erroneous deprivation and benefits of additional process, and government interest).

the opportunity to present evidence that they are unable to satisfy court debt."[11] *Stinnie*, 355 F.

Supp. 3d at 531. As noted, the district court emphasized that, in contravention of the Supreme

Court's clear holding in *Bell*, the challenged Virginia law did "not provide *any* hearing, much less

one that satisfie[d] due process." *Id.* at 529 (emphasis in original).

      That is precisely the problem with D.C.'s Clean Hands Law, as application of the *Mathews*

factors confirms.

      ***Private interest affected.*** As to the first *Mathews* factor, the private interest in a driver's

license is "important," *Bell*, 402 U.S. at 539, and "substantial." *Mackey v. Montrym*, 443 U.S. 1,

11 (1979). "Once licenses are issued . . . , their continued possession may become essential in the

pursuit of a livelihood." *Bell,* 402 U.S. at 539; *see also Wooley v. Maynard*, 430 U.S. 705, 715

(1977) ("driving an automobile" is "a virtual necessity for most Americans"); *Delaware v. Prouse,*

440 U.S. 648, 662 (1979) ("Automobile travel is a basic, pervasive, and often necessary mode of

transportation to and from one's home, workplace, and leisure activities."); *Quick*, 331 A.2d at 323

("It hardly needs saying that a large portion of our society is in various degrees dependent upon

the automobile in making a living.").[12] Thus, as the U.S. Department of Justice observed in *Stinnie*,

---

[11] Following the court's ruling, the Virginia legislature repealed the Commonwealth's law automatically suspending driver's licenses for unpaid court debt, and reinstated previously suspended driver's licenses. 2020 Va. Acts 965 (S.B. 1), §§ 2-3 (approved April 9, 2020) (repealing Va. Code § 46.2-395 and reinstating driver's licenses suspended before July 1, 2019 solely for failure to pay fines). This repeal had the effect of restoring an estimated 627,000 Virginia residents' drivers licenses. See *Lawmakers vote to eliminate license suspensions*, ASSOCIATED PRESS, (April 3, 2019), https://www.nbc12.com/2019/04/04/lawmakers-vote-eliminate-license-suspensions/.

[12] An exhaustive review of census and available employment data for the greater Washington metropolitan area reinforces this repeated judicial observation. *See* Tomer, , *Missed Opportunity: Transit and Jobs in Metropolitan America*, at 16 tbl.3, 46 app. 5 (finding that approximately one in three jobs in the metropolitan Washington area is accessible via public transit within 90 minutes, fewer than one in five jobs is accessible within 60 minutes, and fewer than one in ten jobs is accessible within 45 minutes).

"[d]epriving individuals of the use of their vehicle can imperil their ability to earn a living, pursue educational opportunities, and care for family." *See* U.S. DEPT. OF JUSTICE, Statement of Interest, *Stinnie*, No. 3:16-cv-00044-NKM-JCH, (ECF No. 27).

Plaintiffs' lived experiences validate this observation. All but one Plaintiff, despite having had jobs before, are currently unemployed. Some specifically identify the Clean Hands Law as an obstacle to having a job. *See* Ex. E, Jones Decl. ¶ 9 (attesting that as a college graduate with experience working in white collar jobs, "[i]f my license were to be reinstated, I would be able to. . . . try to find employment. . . . Since I cannot drive, it greatly limits my ability to find any meaningful work"); Ex. H, Hall Decl. ¶ 7 ("[i]f I had a license, I would be able to . . . look for work."). Plaintiffs' lived experiences also highlight how license deprivation imperils their ability to care for family. Evelyn Parham attests that without her driver's license, "I now care for my elderly mother, who lives with me and is disabled. I need to pay people to take my mother for her medical appointments. . . ." Ex. D, Parham Decl. ¶ 9. Carlotta Mitchell attests that she has considerable difficulty visiting her family and that, though she wanted to help her sister with a recent move, "because I have no license I could not do so." Ex. F, Mitchell Dec. ¶ 6. Dominique Roberts attests that "because I cannot legally drive my youngest child is unable to participate in after school activities she enjoys, like volleyball," that she "was forced to spend money for driving school when my oldest daughter needed to qualify for her learner's permit," and, further, that "I am frequently unable to take care of my mother, who also does not drive." Ex. G, Roberts Dec. ¶ 5.

Not having a driver's license makes it far more difficult to navigate the necessities of daily living. That is why the Supreme Court and D.C. Court of Appeals held long ago that a driver's

license is a constitutionally protected property interest, the deprivation of which requires a meaningful hearing before becoming effective. *Bell*, 402 U.S. at 242; *Quick,* 331 A.2d at 321.

**Risk of unjustified deprivation and probable value of additional safeguards**. Applying the second *Mathews* factor, the District's failure to provide Plaintiffs any hearing *at all* creates a grave risk of the unjustified or mistaken deprivation of a driver's license. Under a line of cases beginning with *Griffin v. Illinois,* 351 U.S. 12 (1956), the "convergence" of the Equal Protection and Due Process guarantees of the Fifth Amendment prohibits penalizing people for their poverty, including depriving them of driver's licenses based on their debts without first inquiring into their ability to pay and determining that their nonpayment is willful. *See* Section I.B., *infra,* discussing, *e.g.*, *Bearden v. Georgia*, 461 U.S. at 668-69 (1983) (a state may not revoke an individual's probation for failure to pay fines without determining that they "willfully refused" to make payment). Yet by providing Plaintiffs no hearing at all, that is exactly the risk the Clean Hands Law creates. With no inquiry into ability to pay, Plaintiffs are barred from showing that their failure to pay is not willful but instead the result of their financial instability. For Plaintiffs and other District residents of limited means, the absence of a hearing produces not only the *risk* of an unjustified deprivation, but the *actual* unjustified deprivation, of a driver's license based on their poverty.

There is another way the absence of a pre-deprivation hearing under the Clean Hands Law risks the unjustified deprivation of a driver's license: bureaucratic mistakes. For example, as explained above, residents who experience homelessness, or who move frequently for other reasons, or who otherwise fail to receive infraction notices due to DMV errors, may remain unaware of tickets they have been issued for years. *See, e.g.*, *Drivers try to fight back against decades old tickets issued by DC DMV*, Fox 5, *supra* (residents seeking renewals at DMV "forced

to pay thousands of dollars in old tickets that they never knew about"). And because there is a self-evident correlation between poverty and housing instability, District residents in poverty are more likely than individuals of greater means not to receive notice of their outstanding tickets and debts. In other cases, D.C. residents sharing the same name as other drivers are wrongly identified as having parking or traffic debt, but do not learn of that debt—and the District's error—until the District denies them a new or renewed registration or license under the Clean Hands Law. *See, e.g.*, Ex. E, Jones Decl. ¶¶ 4-12.

A pre-deprivation hearing, focused on ability to pay, would mitigate the risk of the unjustified or erroneous deprivation of a driver's license that the Clean Hands Law creates. It would permit District residents of limited means, including Plaintiffs, to show they lack the ability to pay their government debt before taking away their licenses, and would enable the establishment of a reasonable alternative to automatic non-renewal for failure to immediately pay the full amount owed, *e.g.*, a means-tested reduction in the amount owed or a reasonable, means-tested, non-draconian payment plan. *See, e.g.*, Ex. B, Committee Report on B24-0237, at at 59, 78 n.133 (detailing examples from Iowa and Arizona in which total revenue recouped from fines increased after the government tailored the fine amounts to debtors' ability to pay, and identifying academic literature on the efficacy of "graduated" fines that are proportional to income). Additionally, if the claimed debt (or the amount of the claimed debt) is in error, holding a hearing would permit debtors—before taking away their licenses—to contest the assessment and correct the error. Such a pre-deprivation opportunity to be heard not only furnishes a valuable "procedural safeguard." *Mathews*, 424 U.S. at 334-35. As explained above, it is also what Supreme Court precedent requires: "it is fundamental that, except in emergency situations (and this is not one), due process requires that when a State seeks to terminate an interest such as that here involved [*i.e.,* a driver's

license], it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Bell*, 402 U.S. at 542 (citation omitted).

***The government's interest***. Turning to the third *Mathews* factor, the District's interest in maintaining the current, no-hearing Clean Hands scheme is weak. The District's sole stated purpose in extending the Clean Hands Law to apply to licenses was to increase fines and fees payments. *See* Committee Report on Bill 13-828, at 5. Automatically denying driver's license renewal applications from District residents in poverty does not advance this objective. These residents, including the five Plaintiffs here, cannot manufacture money they do not have. Indeed, for these residents, enforcement of the Clean Hands Law *undermines* the District's payment-coercion objective because, by automatically disqualifying them from renewing their licenses, the statute makes it harder for them to find or keep a job and thus diminishes the likelihood they will be able to pay their debts. As the court in *Stinnie* found:

> There is no indication that a loss of license will incentivize individuals to pay court fines and costs where those individuals simply cannot afford to pay. In practice, the loss of a driver's license adversely affects people's ability to gain and maintain employment, often resulting in a reduction of income. This deprives individuals of means to pay their . . . [fines and fees] debt, hindering the fiscal interests of the government.

*Stinnie*, 353 F.Supp.3d at 531; *see also id.* ("the government's stated interest is not support where license suspension causes a decrease in debtor's income"); *Tate v. Short*, 401 U.S. 395, 399 (1971) (finding that imprisoning drivers too poor to pay traffic fines, while ostensibly "imposed to augment the State's revenues," "obviously does not serve that purpose"); *cf. Bearden*, 461 U.S. at 670 ("Revoking the probation of someone who, through no fault of his own, is unable to make restitution will not make restitution suddenly forthcoming.").

Beyond the fact that the Clean Hands Law does not achieve its intended purpose, "the fiscal and administrative burdens" a pre-deprivation hearing would "entail," *Mathews*, 424 U.S. at 335,

are minimal. The proceeding should not require more than a statement of the driver regarding their financial status and the provision of supporting documentation. And although Plaintiffs do not bear the burden of establishing exactly what a pre-deprivation hearing would involve, the District could streamline the proceeding in any number of ways. For instance, it could accept, by mail or e-mail, sworn attestation of the receipt of certain public benefits as conclusive proof of indigency. Establishing a pre-deprivation proceeding, rather than taking the simple step of ending application of the Clean Hands Law to driver's licenses (as the Clean Hands Certification Act will do on October 1, 2023, if it becomes law, *see* Ex. B, Committee Report on B24-0237, at 120), would be a small price to pay to safeguard a constitutionally protected property interest—and to prevent further impoverishment of Plaintiffs and other District residents already in financial distress. *See Bell*, 402 U.S. at 540-41 ("While the problem of additional expense must be kept in mind, it does not justify denying a hearing meeting the ordinary standards of due process") (internal quotation marks and internal citations omitted).

Consistent with the preliminary injunction ruling in *Stinnie*, each of the *Mathews* factors weighs heavily in favor of the conclusion that the District has violated Plaintiffs' procedural due process rights by enforcing the Clean Hands Law to disqualify them from renewing their licenses without providing them a pre-deprivation hearing—or any hearing at all.

***

Based on both *Bell* and an evaluation of the *Mathews* factors, there is a substantial likelihood that Plaintiffs will prevail on the merits of their Fifth Amendment procedural due process claim in Count I of the Complaint.

**B. By automatically disqualifying Plaintiffs from renewing their drivers' licenses based on the nonpayment of their parking and traffic tickets, without any inquiry into their ability to pay, Defendants have violated Plaintiffs' due process and equal protection rights.**

The "convergence" of the Due Process and Equal Protection guarantees of the Fifth Amendment prohibit the government from "punishing a person for his poverty." *Bearden*, 461 U.S. at 671. This prohibition stretches back 65 years. Beginning with *Griffin v. Illinois*, the Supreme Court has repeatedly found that the government violates due process and equal protection rights when access or outcomes in the legal system are conditioned on a person's ability to pay. 351 U.S. 12, 18 (1956) (state may not deny a criminal defendant the right to appeal due to their inability to afford a trial transcript); *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970) (state may not imprison an indigent person beyond the statutory maximum term on account of missed fine payments; if incarceration "results directly from an involuntary nonpayment of a fine or court costs, we are confronted with an impermissible discrimination that rests on ability to pay."); *Tate v. Short*, 401 U.S 395, 397-98 (1971) (striking down state law that authorized imprisoning criminal defendants for failing to pay fines arising out of offenses punishable only by fines); *Bearden*, 461 U.S. at 672-73 (invalidating state law that authorized revocation of criminal defendants' probation based on failure to pay restitution or fines without first inquiring into their ability to pay).

The principle that has emerged from these cases—"the *Griffin* principle,"—is that the government may not enforce a scheme in which individuals who are too poor to pay government-imposed costs or fines get penalized when individuals who can afford to pay the same costs or fines do not. *M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996). To ensure that it does not run afoul of this constitutional prohibition, the government must inquire into an individual's ability to pay, determine that they have the ability to pay, and conclude that their nonpayment is "willful" before imposing on them a penalty that would not be imposed for the same conduct on an individual with

41

the means to pay. *Bearden*, 461 U.S. at 668-69, 672-73. "To do otherwise would deprive" the individual of a liberty or property interest "simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth          Amendment."          *Id.*          at          672-73.

Importantly, the principle that penalties may not be imposed on a person of limited means on account of their inability to pay a fine, if not imposed on a person who is able to pay, "has not been confined to cases in which imprisonment is at stake." *M.L.B.*, 519 U.S. at 111. For instance, in *Mayer v. Chicago*, the Court ruled that an indigent individual convicted of a nonfelony offense may not be denied an appellate record even when their conviction may result in only a fine. 404 U.S. 189, 196-97 (1971). The Court expressly considered and rejected the argument that the *Griffin* principle applies only when an individual's physical liberty is threatened. *Id.* at 197 ("[T]he invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed."). Furthermore, as the Eleventh Circuit has recognized, the "Supreme Court expressly and repeatedly extended *Griffin's* equality principle beyond the realm of criminal justice . . . to state action that burdens important constitutional interests, such as fundamental associational and political participation interests." *Jones v. Governor of Fla.*, 950 F.3d 795, 820 (11th Cir. 2020) (collecting cases).

In determining whether a state law violates the *Griffin* principle by penalizing people of limited means because of their poverty, a reviewing court should assess several factors, including "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose." *Bearden*, 461 U.S. at 666-67 (quoting *Williams*, 399 U.S. at 390)

(brackets in original). These factors are practically the same as the factors a court must consider in determining whether a state law violates procedural due process. *See* Section I.A., *supra.* And for the same reason that Defendants' enforcement of the Clean Hands Law has deprived Plaintiffs of their procedural due process rights, it also has violated Plaintiffs' due process and equal protection rights as expressed in the *Griffin* principle.

*First,* the "individual interested affected"—a driver's license—is, again, "substantial." *Mackey v. Montrym*, 443 U.S. at 11. "It hardly needs saying that a large portion of our society is in various degrees dependent upon the automobile in making a living. Revocation or suspension of an individual's driver's license may be no small matter." *Quick*, 331 A.2d at 323.

*Second,* by depriving Plaintiffs of their driver's licenses altogether, Defendants' enforcement of the Clean Hands Law has a devastating impact on their ability to manage their daily affairs. *See* Section I.A., *infra,* & Exhibits C-H (Plaintiffs' declarations).

*Third,* for Plaintiffs and similarly situated individuals, there is no rational connection between the legislative purpose of debt collection and the legislative means of driver's license non-renewal. The threat of driver's license non-renewal cannot compel people who are too poor to pay parking and traffic tickets and associated late-payment fees to come up with money they do not have; to the contrary, taking away their driver's licenses makes it harder for them to come up with the money because it makes finding and keeping a job more difficult. *See, e.g., Stinnie*, 353 F. Supp. 3d at 531; *Tate*, 401 U.S. at 399; *Bearden*, 461 U.S. at 670.

*Fourth,* the District has alternative means of achieving its objective of securing compliance with assessments for parking and traffic violations. For example, the District could extend the time for making payments to allow individuals of limited means a realistic chance to pay what they owe. Or, as explained above, the District could provide a pre-deprivation hearing that furnishes

outcomes tailored to ability to pay, *e.g.*, a means-tested reduction in the amount owed or a reasonable, means-tested, non-draconian payment plan. *See, e.g.*, Ex. B, Committee Report on B24-0237, at 59, 78 n.133. These alternative methods could permit Plaintiffs and similarly situated residents to retain their driver's licenses and seek and obtain work that would facilitate earlier and more reliable repayment of the fines and fees they owe to the District.

The Fifth Amendment does not permit a scheme in which District residents who cannot afford to pay parking and traffic fines and fees are prohibited from renewing their driver's licenses, while District residents of greater means, who can afford to pay identical fines and fees for identical infractions, are not. Yet this is precisely the scheme that Defendants maintain. By automatically disqualifying Plaintiffs from renewing their driver's licenses for owing the District more than $100, without any inquiry their ability to pay or any determination that the failure to pay is willful, Defendants have violated Plaintiffs' due process and equal protections rights. Plaintiffs have a strong likelihood of success on the merits of their claim in Count II of the Complaint.

## II.     Plaintiffs Are Now Suffering and Will Continue to Suffer Irreparable Injury Unless the Court Grants a Preliminary Injunction

It is well established that "a violation of constitutional rights constitutes . . . irreparable harm *per se.*" *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) (threat of substantial and immediate irreparable injury is assumed where there is an active or threatened violation of plaintiffs' constitutional rights). Thus, there is a "'presumed availability of . . . equitable relief against

threatened invasions of constitutional interests.'" *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (quoting *Hubbard v. EPA*, 809 F.2d 1, 11 (D.C. Cir. 1986)).

In this case, Defendants have violated—and continue to violate—Plaintiffs' due process and equal protection rights. *See* Section I, *supra*. Therefore, they have established irreparable harm "*per se*." *Eastern*, 571 A.2d at 15.

This conclusion is reinforced by Plaintiffs' lived experiences under the Clean Hands regime. Without a driver's license, Plaintiffs are trapped in circumstances that hinder their ability to provide for themselves and their families and prevent them from pursuing economic opportunities. As detailed above, Plaintiffs have trouble finding and keeping work, buying groceries, accessing medical care, and caring for children and aging parents. Evelyn Parham, who incurred parking tickets after running over a pothole disabled her car, stretches her small budget to pay for rides or public transportation to run routine errands, including taking her disabled mother to the doctor and picking up medication. *See* Ex. D, Parham Decl. ¶¶ 9-10. Nichole Jones, a University of the District of Columbia graduate and former public servant, must walk to get from place to place, even though doing so aggravates a muscular cyst. *See* Ex. E, Jones Decl. ¶ 9. Carlotta Mitchell, a former D.C. schoolteacher, must use her limited disposable income to pay for taxis, rideshares and Metro to shop for food outside the food desert in her neighborhood. Ex. F, Mitchell Decl. ¶¶ 7-8. Without a driver's licesnse, Dominique Roberts, a nurse, struggles to raise her three daughters and care for her mother; her youngest child is unable to participate in certain extracurricular activities because she cannot drive. *See* Ex. G, Roberts Decl. ¶¶ 5, 7. Victor Hall, formerly a U.S. Army sergeant who requires regular physical therapy at the VA Hospital Center and Washington Hospital Center, is forced to rely on friends or rideshare services to keep his appointments and visit family members. *See* Ex. H, Hall Decl. ¶¶ 4-7. Damages cannot redress any

of Plaintiffs' injuries. *See Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (the state "will not be able to make a driver whole" for any economic harm or inconvenience caused by erroneously suspended license); *Save Jobs USA v. Dep't of Homeland Security*, 105 F. Supp. 3d 108, 114 (D.D.C. 2021) (economic loss may constitute "irreparable harm where a plaintiff's alleged damages are unrecoverable"); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (loss of opportunity to pursue employment constitutes irreparable harm).

### III.   The Equities Strongly Favor Plaintiffs

Before granting a preliminary injunction, this Court "must determine that 'more harm will result to the movant from the denial of the injunction than will result to the nonmoving party from its grant.'" *In re Est. of Reilly*, 933 A.2d 830, 840 (D.C. 2007) (quoting *District of Columbia v. Greene*, 806 A.2d 216, 223 (D.C. 2002)). Here, that question is not even close.

Plaintiffs must endure ongoing constitutional harms that adversely impact their ability to provide for themselves and their families and diminish their quality of life. Because the Clean Hands Law automatically disqualifies them from a receiving a license as punishment for their unpaid debts, they have difficulty navigating the basic activities of daily life.

Conversely, Defendants will suffer no cognizable injury if they are required to stop enforcing an unconstitutional scheme. *See Gordon v. Holder*, 826 F. Supp. 2d 279, 297 (D.D.C. 2011), *aff'd*, 721 F.3d 638 (D.C. Cir. 2013) ("a potential deprivation of [plaintiff's] constitutional right to due process … outweighs the possible injury to defendants from enjoining enforcement until the merits of [his] claim can be determined"); *Planned Parenthood Ass'n v. Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("there is a likelihood that the Ordinance will be found unconstitutional; it is therefore questionable whether the City has any 'valid' interest in enforcing the Ordinance. Consequently, we find no substantial harm in preventing the City from enforcing.").

46

In fact, because the conduct Plaintiffs seek to enjoin is unconstitutional, Defendants will suffer no cognizable harm even if an injunction is "accompanied by a substantial ancillary effect on the state treasury." *See Stinnie*, 355 F. Supp. 3d at 532 ("While the Court recognizes the [Government's] interest in ensuring the collection of court fines and costs, these interests are not furthered by a license suspension scheme that neither considers an individual's ability to pay nor provides him with an opportunity to be heard on the matter."); *Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("… a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction") (internal citation and quotation mark omitted).

In any event, an injunction will not materially harm Defendants. Defendants will shoulder a *de minimis* administrative burden, having to do nothing more than manually disable the Clean Hands "red flag" in their system to allow these five D.C. resident Plaintiffs to apply to renew their driver's licenses through the ordinary process. Defendants also will suffer no economic harm. As their sworn declarations establish, Plaintiffs cannot afford to pay their outstanding fines and fees, so allowing them to renew their driver's licenses without attempting to compel payment will have no adverse impact on the public fisc. To the contrary, entering a preliminary injunction could *benefit* Defendants. If Defendants permit Plaintiffs to renew their licenses, they could enable Plaintiffs to seek, find and retain employment, which would make Plaintiffs more likely to pay their debts (which an injunction will not erase) and perhaps more likely to generate municipal revenue from income taxes. Additionally, a preliminary injunction will not impede Defendants' ability to collect Plaintiffs' debts by other means, if it so elects. *See* D.C. OFFICE OF THE CHIEF FINANCIAL OFFICER, *Central Collection Unit Frequently Asked Questions*,

https://cfo.dc.gov/node/1526691 (detailing the OCFO's debt collection enforcement on behalf of DC DMV).

The absence of harm to the District is underscored by the fact that its wealth-based driver's license scheme makes it a national outlier. Currently, only two other states in the country still deprive residents of their driver's licenses based on the failure to pay fines and fees. Ex. B, Committee Report on B24-0237 at 76 n.17. Close to home, neither of the District's neigbhors in Maryland and Virginia refuse license renewal for unpaid fines and fees, and as of 2020, neither state has a law that suspends licenses for unpaid fines and fees, either.[13]

Notably, the District itself now acknowledges that Plaintiffs are the clear winner in the balance of equities. By enacting legislation to amend the Clean Hands Law beginning in October of next year, the District has obviated any argument that it will be harmed by an injunction. Through the legislation, the Council has already authorized the funds needed to modify the District's technology to remove the Clean Hands "red flag" for all license applicants with over $100 in District debt, not only Plaintiffs. More broadly, by deciding to no longer prevent Plaintiffs or other indebted residents of limited means from obtaining or renewing their licenses, the District has effectively conceded that Plaintiffs' interest in renewing their licenses trumps whatever harms the District might once have claimed from being deprived of the use of the Clean Hands Law to refuse renewal.

## IV.    An Injunction Will Serve the Public Interest

It is axiomatic that granting a preliminary injunction to end an ongoing violation of the Constitution serves the public interest. *See, e.g., Centro Tepeyac v. Montgomery Cty.*, 722 F.3d

---

[13]*See* 2020 Va. Acts 965 (S.B. 1), § 2 (repealing Va. Code § 46.2-395); *see also* 2020 Md. Laws 150 (S.B. 234), § 1 (repealing Md. Code, Transportation § 17-207 and amending § 26-204(e)(1)).

184, 191 (4th Cir. 2013) (affirming the grant of a preliminary injunction and observing that "[u]pholding constitutional rights surely serves the public interest."). Thus, termination of the unconstitutional enforcement of the Clean Hands Law against Plaintiffs is, standing alone, enough to establish that a preliminary injunction in the public interest here.

But there is more. Plaintiffs have made a robust showing that enforcement of the Clean Hands Law impedes the ability of indigent District residents to manage the necessities of daily life and exacts broader societal costs. By depriving individual of limited means of driver's licenses, the Clean Hands Law not only makes it harder for individuals of limited means to find and keep a job, run essential errands, attend medical appointments, and care for family. It also disproportionately impacts D.C. residents who are Black and/or disabled; compromises local employers' ability to retain employees and maintain a stable workforce; needlessly exposes D.C. residents to criminal punishment for an offense (driving without a license) that is not inherently unsafe; and diverts law enforcement resources away from addressing crimes, especially violent crimes. *See* Facts, Section III.B., *supra*.

The deleterious, racially disparate impact of the Clean Hands Law on Black District residents is particularly problematic. As the D.C. Council's Office of Racial Equity aptly put it, the "current inclusion of driver's licenses in the District's Clean Hands policy disproportionately impacts Black residents' overall quality of life." Ex. B, Committee Report on B24-0237, at 115. And because of the disproportionate harm it inflicts, the Clean Hands Law undermines what the District has formally recognized, through legislation, as the public interest in pursuing "the elimination of racial disparities such that race no longer predicts opportunities ... for residents of the District, particularly for persons of color and Black residents." 67 D.C. Reg. 14390, the Racial

Equity Achieves Results (REACH) Amendment Act of 2020, codified at D.C. Code § 2–1471.01, *et seq.*

To make matters worse, the Clean Hands Law inflicts all of this harm without achieving its objective of payment coercion. *See* Facts, Section IV. It also does its damage without any salutary effect on public safety. As the lead sponsor of the bill to reform the Clean Hands Law has recognized, District residents who are unable to pay their fines and fines are no more harmful to public safety than residents who commit the exact same parking or minor traffic violations but have the income or wealth to afford to pay. *See* D.C. Committee of the Whole, *Thirtieth Additional Legislative Session*, at 30:08 (May 24, 2022) http://dc.granicus.com/MediaPlayer.php?view_id=3&clip_id=7480 (statement of Councilmember Kenyan McDuffie) ("There's no evidence to suggest that Clean Hands promotes public safety. There's no evidence that it promotes public safety generally or safe driving specifically.").

Ending an unconstitutional, wealth-based driver's license regime that does as much societal damage as the Clean Hands Law—especially without achieving its objective—is self-evidently in the public interest. Indeed, by prospectively abolishing this regime, the District *itself* has recognized that granting Plaintiffs the relief they seek is in the public interest. Plaintiffs should not have to wait over 14 months for relief that the public interest—and the Constitution—compel now.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' Motion and enter an order preliminarily enjoining Defendants from enforcing the Clean Hands Law to prevent Plaintiffs from applying to renew their D.C. driver's licenses.

**DATE**: July 21, 2022

Respectfully Submitted,

*/s/ Ariel Levinson-Waldman*

Ariel Levinson-Waldman (Bar # 474429)
Joshua M. Levin (Bar # 1048088)
Tzedek DC
UDC David A. Clarke School of Law
4340 Connecticut Ave NW, Suite 319
Washington, DC 20008
Tel: (202) 441-9959
alw@tzedekdc.org
jl@tzedekdc.org

*/s/ Seth Rosenthal*

Seth Rosenthal (Bar # 482586)
Claude Bailey (Bar # 378000)
Andrew Dickson (Bar # 1618684)
Spencer Kaye (Bar # 1723914)
Kirsten Bickelman (Bar # 1780402)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Tel: (202) 344-4000
sarosenthal@venable.com
cebailey@venable.com
abdickson@venable.com
srkaye@venable.com
knbickelman@venable.com

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **EVELYN PARHAM**, **NICHOLE JONES**, **CARLOTTA MITCHELL**, **DOMINIQUE ROBERTS**, and **VICTOR HALL**, <br><br>*Plaintiffs*, <br><br>v. <br><br>**DISTRICT OF COLUMBIA**; **GABRIEL ROBINSON**, Director of the District of Columbia Department of Motor Vehicles, in his official capacity; **GLEN LEE**, Chief Financial Officer for the District of Columbia, in his official capacity, <br><br><br>*Defendants*. | **Case No.: 2022 CA 003151 B** <br><br>**Hon. Heidi M. Pasichow—Civil Calendar 12** <br><br>**Next Event: Initial Scheduling Conference—October 28, 2022, 9:30 AM** |

**[PROPOSED]**
**ORDER GRANTING ENLARGEMENT OF PAGE LIMITS**

Upon consideration of Plaintiffs' Unopposed Motion for Enlargement of Page Limits for Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Preliminary Injunction ("Motion"), without opposition from Defendants, and for good cause shown, the Motion is hereby GRANTED.

It is further ORDERED that the page limit for Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Preliminary Injunction is enlarged to 50 pages.

Entered this __ day of _____, 2022.

_____
**Hon. Heidi M. Pasichow**
**Associate Judge, District of Columbia**
**Superior Court**