**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| EVELYN PARHAM, *et al.*, |
| Plaintiffs, |
| v. |
| DISTRICT OF COLUMBIA, *et al.,* |
| Defendants. |

Civil Action No. 22-2481 (CKK)

**MEMORANDUM OPINION**
(December 27, 2022)

District of Columbia residents Evelyn Parham, Nichole Jones, Carlotta Mitchell, Dominique Roberts, and Victor Hall ("Plaintiffs") filed a Complaint against the District of Columbia; Gabriel Robinson, Director of the District of Columbia Department of Motor Vehicles; and Glen Lee, Chief Financial Officer for the District of Columbia ("Defendants") alleging that the District of Columbia's Clean Hands Law violates the Fifth Amendment guarantees of procedural due process, equal protection, the convergence thereof, and substantive due process.

D.C.'s Clean Hands Law, D.C. Code § 47-2861, *et seq.*, disqualifies applicants from obtaining or renewing a driver's license if they owe more than $100 in parking, traffic, or other fines and fees.  Compl. ¶ 1.  Plaintiffs fall within this category of applicants.  Each Plaintiff had a driver's license until the Clean Hands Law prevented renewal, Pls.' Reply at 1, and as a result, they now struggle with daily activities including keeping a job, caring for family members, and receiving health care, Pls.' Mot. at 1.

Now before the Court is Plaintiffs' [4] Motion for Preliminary Injunction.  Plaintiffs ask the Court to enjoin enforcement of the Clean Hands Law, which will enable Plaintiffs to be

1

considered for driver's licenses.  *See* Pls.' Mot. at 1.  Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as it currently stands, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.

# I. BACKGROUND

## A.  D.C. Clean Hands Law

As relevant here, D.C.'s Clean Hands Law provides that "[n]otwithstanding any other provision of law, the District government shall not issue or reissue a license or permit to any applicant for a license or permit if the applicant:… [o]wes the District more than $100 in outstanding fines, penalties, or interest assesses pursuant to the following acts or any regulations promulgated under the authority of the following acts," which includes code sections governing littering, dumping, consumer violations, car insurance laws, and parking and traffic violations; "[o]wes the District more than $100 in past due taxes;" or "[o]wes the District more than $100 in outstanding fines, penalties or interest."  D.C. Code § 47-2862(a).  The Clean Hands Law was first passed in 1996 and expanded in 2001 to include parking and moving infractions with the goal of generating additional revenue.  *See* Pls.' Mot. at 4–5; Pls. Mot. Ex. A at 5.

D.C. enforces the Clean Hands Law through the Department of Motor Vehicles ("DMV") and the Office of the Chief Financial Officer ("OCFO").  When D.C. residents apply to obtain or renew a driver's license, the DMV checks an OCFO database to determine whether that resident

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Compl., ECF No. 1-2 ("Compl.");
- Pls.' Mot. for Prelim. Inj., ECF No. 4 ("Pls.' Mot.");
- Defs.' Mot. to Dismiss and Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 8 ("Defs.' Opp'n"); and
- Pls.' Reply in Support of Mot. for Prelim. Inj. and Opp'n to Defs.' Mot. to Dismiss, ECF No. 11 ("Pls.' Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

owes more than $100 to the District.  Pls.' Mot. at 5; Pls.' Mot. Ex. B.  If they do, their application transaction is automatically terminated and application denied.  Pls.' Mot. Ex. B.

### B.  Impact of Clean Hands Law

A report from the D.C. Council Committee on Business and Economic Development indicated that the number of D.C. residents impacted by the Clean Hands Law when attempting to obtain or renew a driver's license is, conservatively, in the tens of thousands.  Pls.' Mot. Ex. B at 46.  These residents, unable to afford the fines and fees imposed by the District, must now also contend with additional burdens imposed by not having licenses.  Dropping children off at childcare, attending doctor's appointments, caring for elderly relatives, running errands, and even traveling to and from a place of employment become challenges.

Plaintiffs are among the D.C. residents facing such challenges.  Plaintiff Evelyn Parham received numerous tickets, despite being assured otherwise by government officials, after her car was damaged by a pothole in D.C.  Pls.' Mot. at 9–10.  Her license expired in April 2019 and she has not driven since.  *Id.* at 10.  The DMV has informed her that she cannot renew her license until she pays over $900 to the District, although she is unable to pay these outstanding fines and fees.  *Id.*  Without a license, she struggles to run errands, conduct other daily tasks, and care for her elderly, disabled mother.  *Id.*; Compl. ¶ 79.

Plaintiff Nichole Jones held a career in public service before being seriously injured in an accident.  Pls.' Mot. at 10.  She is now unable to work, receives no government assistance, and has unstable housing.  *Id.*  Ms. Jones is unable to pay her outstanding debt—accumulated through driving-related tickets—and therefore no longer has a driver's license.  *Id.* at 11.  Despite a cyst on her foot causing limited mobility, she tries to venture throughout the city on foot.  *Id.*

Plaintiff Carlotta Mitchell is a college graduate and former elementary school teacher and

business consultant.  *Id.*  She is now unemployed and lacks stable housing.  *Id.*  Ms. Mitchell could not afford to renew her car's registration, leading to parking tickets issued during her stay in various shelters.  *Id.*  She could not afford to pay these debts in order to renew her driver's license and must therefore rely on taxis, rideshares, and public transportation to even do seemingly mundane tasks such as visit the grocery store, as there are few in her area.  *Id.* at 12.

Plaintiff Dominique Roberts is a single mother of three children and a nurse at Washington Hospital Center.  *Id.*  She owes the District fines and fees from two parking tickets and two speeding tickets, issued when she drove between eleven and twenty miles over the posted limit.  *Id.*  Her driver's license expired in 2019 and she was barred renewal.  *Id.*  She is currently paying off her debt incrementally.  *Id.*  Ms. Roberts struggles to raise her children and afford them the opportunities she wishes; she also struggles to care for her mother.  *Id.*

Plaintiff Victor Hall served as a reservist with the D.C. National Guard and in active duty as an Army sergeant.  *Id.*  He has not worked in his field of HVAC maintenance and repair since an injury two years ago.  *Id.* at 13.  His driver's license expired in 2013 and he was unable to pay his outstanding debt to renew it.  *Id.*  If issued a driver's license, Mr. Hall would actively look for work, visit family, and consistently attend medical and physical therapy appointments.  *Id.*

As noted above, these five Plaintiffs are just some of the tens of thousands of D.C. residents who have been barred from receiving driver's licenses under the Clean Hands Law.  In addition to the specific and grave harms suffered by each resident, the law has had broader societal impacts.  For example, D.C. Council's Office of Racial Equity found that ending the application of the Clean Hands Law to driver's licenses "will likely improve… [the] quality of life outcomes for Black residents who have a debt to the District government."  Pls.' Mot. Ex. B at 117.  Doing so would also mitigate the burden on D.C. residents with disabilities, those who

lack stable housing, and those who are struggling to maintain steady employment. *See* Pls.' Mot. at 13–16.

The D.C. Council has recognized these and other harms enacted by the Clean Hands Law and taken action. In 2018, the Council ended the automatic suspension of driver's licenses based on fines and fees and required the DMV to restore all licenses suspended solely on that basis. *Id.* at 18–19. Once that law went into effect, the DMV restored the licenses of 15,521 residents. *Id.* at 19 (citing D.C. Dep't of Motor Vehicles, *DC DMV Communication Related to Reinstating Suspended Driver Licenses and Driving Privileges* (Dec. 10, 2018), at 57, https://dccouncil.us/wp-content/uploads/2019/02/dmv19.pdf). More recently, the Council voted unanimously to enact the Clean Hands Certification Equity Amendment Act of 2022, which repeals the Clean Hands Act's provision regarding issuance and renewal of driver's licenses. *Id.* at 20 (citing Council of the District of Columbia, *Voting Information for B24-0237*, https://lims.dccouncil.us/Legislation/B24-0237). The change will become effective no earlier than October 1, 2023. *Id.* at 21 (citing *Clean Hands Certification Equity Amendment Act of 2022*, DC B24-0237 (2021)). Until then, Plaintiffs and thousands of other D.C. residents remain unable to renew their driver's licenses.

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

the balance of equities tips in his favor, and [4] that an injunction is in the public interest."
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392
(quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)).  When
seeking such relief, "'the movant has the burden to show that all four factors, taken together,
weigh in favor of the injunction.'"  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)
(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  "The
four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291 (citation
omitted).  Under this sliding-scale framework, "[i]f the movant makes an unusually strong
showing on one of the factors, then it does not necessarily have to make as strong a showing on
another factor."  *Id.* at 1291–92.

The Court notes that it is unclear whether the Circuit's sliding-scale approach to
assessing the four preliminary injunction factors survives the Supreme Court's decision in
*Winter*.  *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C.
2015) (TSC).  Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to
hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary
injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J.,
concurring)); *see also Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*, 897 F.3d 314,
334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale'
approach to weighing the four factors be abandoned").  However, the D.C. Circuit has yet to hold
definitively that *Winter* has displaced the sliding-scale analysis.  *See Sherley*, 644 F.3d at 393;
*Save Jobs USA*, 105 F. Supp. 3d at 112.  This Court need not resolve the viability of the sliding-
scale approach today, as it finds that each of the preliminary injunctive factors favors awarding
relief on the pending motion.

## III. DISCUSSION

The District of Columbia "is a political entity created by the federal government" and therefore "subject to the restrictions of the Fifth Amendment, not the Fourteenth." *Propert v. D.C.*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). However, the due process and equal protection guarantees of the two Amendments are the same. *Id.*

Plaintiffs raise four Fifth Amendment claims: violation of procedural due process; violation of due process and equal protection; violation of equal protection; and violation of substantive due process. The Court finds that Plaintiffs have demonstrated likely success on the merits for their first claim, violation of procedural due process. The Court therefore does not engage in analysis as to any of the other claims in Plaintiffs' Complaint.

The Court also finds that Plaintiffs have demonstrated irreparable injury and that the balance of equities and public interest weigh in their favor. Notably, Defendants conceded these preliminary injunction factors by failing to respond to Plaintiffs' arguments whatsoever in its opposition papers. *See Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009) (RMU); Order at 4–5, ECF No. 3. The Court nevertheless engages in brief discussion of these factors.

Altogether, the Court holds that Plaintiffs have met their burden to demonstrate the need for injunctive relief at this stage of the litigation. The Court will grant Plaintiffs' Motion for Preliminary Injunction for the reasons that now follow.

### A. Likelihood of Success on the Merits

Plaintiffs contend that "Defendants' enforcement of the Clean Hands law against Plaintiffs [] violates procedural due process" because the law "automatically disqualifies

Plaintiffs and other DC residents who owe the District more than $100 from obtaining or renewing a driver's license" without first providing an opportunity for a hearing.  Compl. ¶¶ 108–10.  "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections."  *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  "The three basic elements of a procedural due process claim are (1) a deprivation, (2) of life, liberty, or property, (3) without due process of law."  *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 35–36 (D.D.C. 2013) (CKK).

The Court finds that Plaintiffs have sufficiently shown a protected property interest of which they were deprived without process so as to support a likelihood of success on the merits. The Court therefore does not discuss any alleged liberty interest.

### 1.  Property Interest

The Supreme Court has recognized a protected property interest in retaining a driver's license.  In *Bell v. Burson*, the Court held that "[o]nce licenses are issued… their continued possession may become essential in the pursuit of a livelihood.  Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees.  In such cases the licenses are not to be taken away without that procedural due process."  *Bell v. Burson*, 402 U.S. 535, 539 (1971).  Furthermore, the Court has stated that case law holding "[t]hat the Due Process Clause applies to a state's suspension or revocation of a driver's license is clear."  *Mackey v. Montrym*, 443 U.S. 1, 10 n.7 (1979).  Courts in this Circuit have applied this precedent, stating that "[p]rocedural due process requires that a fair hearing be held prior to permanent suspension of a driver's license."  *Gilles v. Touchstone*, 676 F. Supp. 341, 344 (D.D.C. 1987) (Hogan, J.).

The Supreme Court in *Bell* was concerned with the "suspension" of licenses and the

concomitant procedural safeguards that are to be accorded when licenses are "taken away." *See Bell*, 402 U.S. at 539.  But here, there were no licenses to be "taken away."  Instead, Plaintiffs' driver's licenses were set to expire by their own terms.

Plaintiffs argue that "Plaintiffs' licenses did not naturally expire by their terms such that, via renewal, Plaintiffs would be 'obtaining' licenses as if for the first time.  Rather, through renewal, Plaintiffs would retain licenses they already possessed."  Pls.' Reply at 2.  However, D.C. law indicates otherwise.  D.C. "grants licenses for a set period of years, after which they expire," "at which point the driver will not be able to continue to legally drive in the District unless they have obtained a new license through renewal."  *Wall v. Babers*, 82 A.3d 794, 799–800 (D.C. 2014) (citing D.C. Code § 50–1401.01(a)(1); D.C. Mun. Regs. tit. 18, § 110.1).  More specifically, the issuance of a license is "valid for a period not to exceed 8 years plus any time period prior to the expiration date of a previous license not to exceed 2 months."  D.C. Code § 50–1401.01(a)(1).  D.C. regulations further specify that "the initial term of a driver's license… shall expire on the licensee's birth date occurring in the eighth (8th) year of the license term, and may thereafter be renewed for up to an eight (8)-year period."  D.C. Mun. Regs. tit. 18, § 110.1.  Altogether, D.C. law establishes that a driver's license is issued for a finite period, after which it expires.

Plaintiffs argue that because licensees are eligible to renew their licenses before expiration, the "Clean Hands Law… interfere[s] with a license during its 'defined term'" and therefore with Plaintiffs' ability to retain licenses already possessed, i.e., licenses that had not expired.  Pls.' Reply at 3 (citing D.C. Dep't of Motor Vehicles, *Renew a REAL ID or Limited Purpose Driver License*, https://dmv.dc.gov/node/1119107); *see also* D.C. Mun. Regs. tit. 18, § 110.7 (D.C. license-holders may apply for renewal "at any time in advance of expiration of a

current license"); *but see id.* § 110.9(c) (indicating license-holders can apply for renewal by mail or online within one year after the licenses' expiration). However, the fact that licensees may apply for renewal before their licenses expire does not change the fact that those licenses in fact have expiration dates. According to D.C. law, Plaintiffs' drivers' licenses naturally expired.

With this in mind, the issue of a denial of renewal is different than a suspension or revocation—in the first instance, state action occurs when the license had expired or was about to expire by its terms, and in the second instance, the action occurs during the time period of the license's issuance. *Bell* and its progeny only speak to the latter instance: a suspension or revocation during the time period of the license's issuance that disrupts the protected property interest in retaining a driver's license. In the present case, Plaintiffs cannot point to this recognized property interest of *retaining* one's driver's license, as their argument is about *renewing* their driver's licenses. Accordingly, Plaintiffs' procedural due process claim can only move forward if there is a recognized property interest in renewing a driver's license.

The contours of a putative property interest, including the one at issue here, "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *see also Paul v. Davis*, 424 U.S. 693, 710 (1976) (stating that property "interests attain… constitutional status by virtue of the fact that they have been initially recognized and protected by state law"). In order to possess a constitutional property interest in a benefit, such as a driver's license, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "Generally, a 'claim of entitlement'

is not viable when a government agency wields significant or unfettered discretion in determining whether to award or rescind a particular benefit or when an individual lacks an objective basis for believing that he is entitled to retain a benefit."  *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016) (citing *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 35–36 (D.C. Cir. 1997); *Hall v. Ford*, 856 F.2d 255, 265–67 (D.C. Cir. 1988)).

Plaintiffs contend that they have "a property interest in renewing their licenses because of their legitimate claim of entitlement in renewal."  Pls.' Reply at 2–3 (citation and quotation omitted).  The Court finds that there is a viable argument that licensees have a legitimate claim of entitlement in renewal of a driver's license for the reasons below.

Defendants rely on a District of Columbia Court of Appeals opinion, *Wall v. Babers*, for the proposition that "it would be illogical to treat the renewal of a license differently than the issuance of a license for the first time."  *Babers*, 82 A.3d at 800; *see* Defs.' Opp'n at 7–8.  In response, Plaintiffs correctly point out that the "passage comes not from the… section… addressing the procedural due process claim in that case, but rather from the section addressing" a claim that D.C. "violated D.C. law by rejecting the plaintiff's application for renewal based on the unresolved suspension of his driving privileges in two other states" due to unresolved speeding violations.  Pls.' Reply at 4; *Babers*, 82 A.3d at 801.  Plaintiffs also correctly point out that the passage continues, Pls.' Reply at 5: "[I]t would be illogical to treat the renewal of a license differently than the issuance of a license for the first time, given the District's authority to revoke or suspend licenses," *Babers*, 82 A3d at 800.  The passage continues further: "If the District has the ability to suspend an individual's active license, it makes little sense to require the District to automatically renew a license with the same deficiencies."  *Id.* (internal citations omitted).  The deficiencies there were the plaintiff's traffic violations and questionable "ability

and willingness to abide by the rules and regulations regarding the operation of a motor vehicle in the District, [] which in turn exist to promote the safety and welfare of D.C. residents." *Id.* at 801. The Court finds that this context changes the import of the D.C. Court of Appeals' statement and, in turn, the proposition that Defendants offered.

Renewal may raise issues for a licensee who bears deficiencies that are grounds for suspension—in *Wall*, unresolved violations that may threaten public safety—but that is not necessarily true for a licensee without such deficiencies. And while, as the Court of Appeals noted, the District "has the authority to treat renewals just like applications for new licenses," *id.* at 800 (citing D.C. Code § 50–1401.01(a)(1); D.C. Mun. Regs. tit. 18, § 110.5), that does not necessarily refute a claim of entitlement to renewal where there are no deficiencies standing in the way. For many D.C. residents, the Clean Hands Law is the only barrier to either receiving a new license in the first instance *or* receiving a license renewal.

Finally, both Plaintiffs and the Court emphasize that in the very same opinion, *Wall v. Babers*, the Court of Appeals "assume[d] without deciding that [plaintiff] had a property interest in having his license renewed" before proceeding to "consider what process [plaintiff] was due under the circumstances." *Id.* at 801. The Court accords this significant weight, as it is the only opinion mentioning, let alone opining on, whether D.C. law creates a property interest in license renewal for the purposes of procedural due process.[2]

The Court now returns to the touchstone question of whether D.C. law gives "significant or unfettered discretion" to the government agency in renewing licenses. *See Crooks*, 845 F.3d at

---

[2] "We construe D.C. law as it has been interpreted by the D.C. Court of Appeals, *see Poole v. Kelly*, 954 F.2d 760, 761 (D.C. Cir. 1992)—or, in the absence of such guidance, as we predict that court would interpret it, *see, e.g.*, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 824 & n. 13 (D.C. Cir. 1984)." *Griffith v. Lanier*, 521 F.3d 398, 401 (D.C. Cir. 2008).

419.  The D.C. Code provides that D.C. "is authorized to issue a new or renewed motor vehicle

operator's permit… subject to the following conditions and any other conditions the Mayor may

prescribe *to protect the public."*  D.C. Code § 50–1401.01(a)(1) (emphasis added).  Later, the

statute states that an "applicant shall demonstrate that he or she is mentally, morally, and

physically qualified to operate a motor vehicle in a manner *not to jeopardize the safety of*

*individuals or property*," and that D.C. "shall determine whether an applicant is qualified

through" an examination testing knowledge of traffic regulations, a driver's test, and "[a]ny other

criteria as the Mayor may establish."  *Id.* § 50–1401.01(a)(1)(B) (emphasis added).

The D.C. Court of Appeals addressed this statute in *Wall v. Babers*, noting that "[t]he

DMV is given broad discretion to determine who is qualified to receive and retain a license."

*Babers*, 82 A.3d at 798–99.  However, as the Court of Appeals recognized, this "broad

discretion" is explicitly cabined to that which will "protect the public," D.C. Code § 50–

1401.01(a)(1),[3] going on to clarify that such discretion is the District's "broad statutory and

regulatory authority to promote 'the safety of individuals or property' in the District."  *Babers*,

82 A.3d at 801 (quoting D.C. Code § 50–1401.01(a)(1)(B)).  Per the text of the D.C. Code itself,

and as confirmed by the D.C. Court of Appeals, the government can only impose additional

conditions on driver's license renewals that further public safety.

A D.C. regulation specific to "Renewal of Driver Licenses" imposes some such

conditions when outlining the parameters for renewal.  *See* D.C. Mun. Regs. tit. 18, § 110.  For

example, D.C. "may require" applicants for renewal to "take and successfully pass a test of the

---

[3] As additional context, the Court of Appeals made its observation about "broad discretion" when
finding that "the DMV had the authority and discretion to require [plaintiff] to clear up his
driving record in other states before it issued him a new license."  *Babers*, 82 A.3d at 798.  The
plaintiff's driver's license was suspended in other states due to speeding violations.  *Id.* at 796.

applicant's eyesight and knowledge of the traffic laws," *id.* § 110.4, or additional tests "reasonably necessary to determine the licensee's qualifications," *id.* § 110.5, which may include tests on "knowledge of safe driving practices, knowledge of the traffic and motor vehicle laws and regulations, knowledge of the motor vehicle insurance laws and regulations of the District, and any further physical or mental examination required by the Director to determine the applicant's fitness to operate a motor vehicle safely," *id.* § 104.2. These conditions all relate to furtherance of public safety, which is in line with the D.C. Code's mandate.

The regulation also provides instructions for renewal applications, stating that an "applicant may apply by mail or through the internet provided the applicant meets the following requirements," those being that they are not subject to re-examination, as prescribed by certain narrow provisions; they meet visual requirements; their license has not been expired for more than one year; they are renewing for the standard eight-year period; and there has not been a material change in personally identifiable information, in which case the applicant has to seek renewal in person. *Id.* § 110.9. Altogether, D.C.'s "Renewal of Driver Licenses" regulation creates only circumscribed requirements for license renewal. Although D.C. may require additional test-taking or examinations, such tests are utilized only to ensure that drivers maintain the proper physical and mental fitness to be on the road; meanwhile, the regulation sets out an easy procedure for renewing one's license.

Compared to other statutory regimes, these provisions impose substantial limitations on the DMV in deciding license renewal. The D.C. Circuit has explained that "an individual has no 'cognizable property interest' in the renewal of a license or certification where the applicable agency 'regulations explicitly permit the agency to not renew an [applicant] for any reason deemed appropriate by the [government].'" *Crooks*, 845 F.3d at 419 (citing *Fried v. Hinson*, 78

F.3d 688, at 692 (D.C. Cir. 1996); *Lopez v. FAA*, 318 F.3d 242, 249 (D.C. Cir. 2003)).  For

example, in *Fried v. Hinson*, the court found there was no cognizable property interest where the

U.S. Code allowed an Administrator to "rescind a delegation… *at any time for any reason*" and

therefore plaintiff had "no legal entitlement to renewal."  *Fried*, 78 F.3d at 689, 692 (citing 49

U.S.C. § 44702(d)) (emphasis added).   In *Lopez v. FAA*, the court found there was no "property

interest in renewal of [a certain] designation" where a Federal Aviation Act Order stated that

"designation… is a privilege granted" and "[i]t is not the right of every qualified applicant to be

granted [such a] designation."  *Lopez*, 318 F.3d at 249.  In *Haymon v. D.C.*, the district court

found no property interest in a commissioned special police officer position where the D.C. Code

"provide[d] substantial removal protections for MPD officers while carving out an exception for"

the special police officer position at issue, allowing such an officer to be removed without cause

and without trial.  *Haymon v. D.C.*, No. 21-886 (RDM), 2022 WL 2304047, at *5 (D.D.C. June

27, 2022) (citing D.C. Code § 5-127.01).  In these cases, unfettered discretion allowed

government officials to deny a renewal for seemingly any reason at all.  In contrast, the operative

D.C. Code (and D.C. Municipal Regulations) provisions are far more constrained, allowing the

imposition of conditions that could thwart renewal only when in furtherance of public safety.

The Court also notes that both the D.C. Code and D.C. Municipal Regulations include

greater substantive directives—e.g., what types of conditions can be imposed, what types of tests

can be required—than other laws where courts found "substance-less directives" to be giving

"virtually unlimited discretion," and therefore no property interests existed.  *George Washington*

*Univ. v. D.C.*, 318 F.3d 203, 207–08 (D.C. Cir. 2003) (citing *Gardner v. City of Baltimore Mayor*

*& City Council*, 969 F.2d 63, 70 (4th Cir. 1992); *Jacobs, Visconsi & Jacobs, Co. v. City of*

*Lawrence, Kan.*, 927 F.2d 1111, 1116–17 (10th Cir. 1991)).

Altogether, the Court finds that D.C. law grants very little discretion to the government in determining whether to renew driver's licenses.  Renewal is largely perfunctory,[4] subject only to conditions imposed to ensure public safety, which take the form of vision or traffic knowledge exams, for example.  Accordingly, as D.C. law creates the expectation that renewals will be granted, applicants have a viable argument of a legitimate claim of entitlement to such renewals.

This conclusion is in accord with case law from other Circuits finding that the renewal of driver's licenses is in fact a protected property interest.  *See, e.g.*, *Avery v. Benson*, 831 Fed. Appx. 207, 209 (6th Cir. 2020) (discussing driver's license renewal, stating that "[plaintiff] is correct that he has a property interest in his driver's license"); *Denny v. Richardson*, 234 Fed. Appx. 862, 864 (10th Cir. 2007) (viewing government's "refusal to renew [plaintiff's] driver's license [] in effect a de facto suspension of her license" before explaining that due process protections would apply).[5]

### 2.  Process Afforded

After identifying a protected interest, courts must then determine whether the government's attendant procedures comport with principles of due process.  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010).  This inquiry turns on the three-factor balancing

---

[4] Where the "criterial for renewal" are "undemanding" and "objective," the state "expect[s] most licenses to be renewed as a matter of course."  *Estate of Wobschall by Wobschall v. Ross*, 488 F. Supp. 3d 737, 748 (E.D. Wisc. 2020).

[5] *See also, e.g.*, *Carpman Fitness, LLC v. City of Royal Oak*, 2008 WL 4937959, at *5 (E.D. Mich. Nov. 14, 2008) ("Michigan courts distinguish first-time applicants from existing license holders seeking renewal: license holders have a property interest in keeping the license, but new applicants do not have a property interest if they have not previously been granted a license."); *Estate of Wobschall by Wobschall v. Ross*, 488 F. Supp. 3d 737, 748 (E.D. Wisc. 2020) (concluding that a person has a property interest in renewing a driver's license); *but see, e.g.*, *Stoianoff v. Comm'r of Motor Vehicles*, 107 F. Supp. 2d 439, 448 (S.D.N.Y. 2000) ("States are free to amend vehicle and traffic laws to impose preconditions to license renewals just as they can grant immunity or eliminate welfare or employment programs; without running afoul of the due process clause.").

test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which considers: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. "There is no one-size-fits-all procedure to protect against the unconstitutional deprivation of property." *Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 118 (D.C. Cir. 2020). Instead, the concept of due process is ultimately "'flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Mathews*, 424 U.S. at 334).

Here, D.C. does not afford any opportunity for Plaintiffs to be heard prior to disqualifying them from renewing their driver's licenses. *See* Pls.' Mot. at 29. Rather, disqualification is automatic. *See id.* at 4; *see also* D.C. Code § 47-2862(a). After the DMV checks with the OCFO database, the application transaction of any D.C. resident who owes more than $100 is automatically terminated and their application is denied. *See* Compl. ¶ 59–65; Pls.' Mot. at 5. Those whose applications are denied "may request a hearing within 10 days of the denial on the basis for that denial." D.C. Code § 47-2865(c).

As for the first *Mathews* factor—the private interest affected—the Court finds that Plaintiffs carry their burden at this stage. The Supreme Court has made clear that having a driver's license is "important" and often "essential in the pursuit of a livelihood." *Bell*, 402 U.S. at 539; *see also Wooely v. Maynard*, 430 U.S. 705, 715 (1997); *Delaware v. Prouse*, 440 U.S. 648, 662 (1979). As their Motion and attached affidavits explain, "Plaintiff's lived experiences validate this observation. All but one Plaintiff, despite having had jobs before, are currently

unemployed," due in large part to not having driver's licenses.  Pls.' Mot. at 31.  Plaintiffs demonstrate additional challenges, including a strained ability to care for family.  *Id.* Additionally, the Supreme Court held, when engaging in analysis under *Mathews*, that the private interest in continued possession and use of a license is "a substantial one, for the [government] will not be able to make a driver whole for any personal inconvenience and economic hardship suffered by reason of any delay in redressing an erroneous" deprivation of that benefit.  *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (citing *Dixon v. Love*, 431 U.S. 105, 113) (1977)).

In that same opinion, the Supreme Court recognized that "[t]he duration of any potentially wrongful deprivation… is an important factor in assessing the impact of official action on the private interest involved."  *Id.* at 12.  Here, some Plaintiffs have been without licenses for years due to the Clean Hands Act's disqualification.  *See, e.g.*, Pls.' Mot. at 13 ("Mr. Hall's driver's license expired in 2013"); Compl. ¶ 37 ("Ms. Roberts' driver's license expired in September 2019").  And although the Clean Hands Act will be repealed in October 2023, that is still ten months away.  Accordingly, that the Act will no longer be in force in the future does not cut against the significant private interest at issue here, given that the duration of any potentially wrongful deprivation has been ongoing and will last for ten months more.  *Cf. Scott v. Williams*, 924 F.2d 56, 59 (4th Cir. 1991) (finding the duration short "because a licensee may obtain a remedy immediately" where "upon receiving a notice of suspension, to obtain reinstatement a licensee need only submit a statement from the doctor of his choice, pay the $30 fee, and retake the driver's examination" and therefore holding that "although the private interest is substantial, the impact of official action on that interest is slight").

The Court finds that Plaintiffs also carry their burden as to the second factor: a risk of erroneous deprivation of such interest, as well as the probable value of additional safeguards.

This is true even assuming Defendants are correct that this factor is about "how likely it is that the cause of the deprivation was in error—*i.e.*, the debt that renders Plaintiffs ineligible for a license—and whether the proposed additional safeguards would mitigate potential errors." Defs.' Opp'n at 11.

Plaintiffs explain that "if the claimed debt (or the amount of the claimed debt) is in error, holding a hearing would permit debtors… to contest the assessment and correct the error." Pls.' Mot. at 33. They have provided illustrations of such error. For example, Plaintiff Nichole Jones was arrested and ticketed for driving on a suspended license although she had no prior notice or knowledge of this suspension. *See* Pls.' Mot. Ex. E ¶ 6. Plaintiff Evelyn Parham was issued tickets despite both a government official from the Office of the Mayor and a police department official telling her that she would not be ticketed. *See* Pls.' Mot. Ex. D ¶ 7. D.C. resident Anthony Jones was assessed tickets and penalties that were actually issued to other people with the same name. *See* Pls.' Mot. Ex. C ¶¶ 4–8. Other residents with unstable housing or who "fail to receive infraction notices due to DMV errors may remain unaware of tickets they have been issued for years," which can lead to their fines compounding. Pls.' Mot. at 32; *see also id.* at 6 (explaining how traffic or parking fines and fees can accrue due to late payment). The risk of erroneous deprivation due to such errors would be mitigated with the opportunity for a hearing prior to denying license renewals, ensuring that D.C. residents are not erroneously stripped of their licenses, in doing so inhibiting their freedom and ability to gain employment.

When "prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be." *Mackey*, 443 U.S. at 13. The Court

recognizes that in the case before us, "the predicates for [nonrenewal]… are objective facts," those being the fines flagged by the DMV's database check. *Id.* (describing generally *Love*, 431 U.S. 105). However, such "facts" may be riddled with more error than the facts which the Supreme Court in *Dixon v. Love* held to be sufficient to justify the absence of a pre-deprivation procedure. In that case, the state scheme allowed for suspension of a driver's license based on two officers' observations during an arrest who the Court found to be, "by reason of [their] training and experience, well suited for the role the statute accords [them] in the presuspension process." *Id.* at 13–14 (describing generally *Love*, 431 U.S. 105). Similarly, the Supreme Court in *Mackey v. Montrym* found that "there will rarely be any genuine dispute as to the historical facts providing cause for a suspension," and that in that particular case, the plaintiff did not dispute such facts, but rather, claimed a constitutional right. *Id.* at 14–15. These cases bear contrast to the one now before the Court, in which there may very well be disputes as to the facts underlying D.C. residents' debt, as illustrated above through Plaintiffs' various examples. Accordingly, these errors cast some doubt on the reliability of rejecting Plaintiffs' license renewal applications.

Finally, regarding the third *Mathews* factor, the Court finds the government's interest to be slight. To begin, the Clean Hands Law was not motivated by public safety. Accordingly, this case is dissimilar from those in which courts have found a significant government interest in making roadways safer. *See, e.g.*, *Mackey*, 443 U.S. at 18 (finding that "[t]he Commonwealth's interest in public safety is substantially served by the summary suspension of those who refuse in several ways to take a breath-analysis test upon arrest"); *Scott*, 924 F.2d at 60. The purpose of the Clean Hands Law was to increase fines and fees payments. *See* Pls.' Mot. Ex. A at 5. Accordingly, Defendants contend that the state has a strong interest in revenue collection, Defs.'

Opp'n at 12 (citing *Fowler*, 924 F.3d at 937), but provides no further support regarding how the Clean Hands Law actually achieves that goal.  As Plaintiffs claim an inability to pay the fines and fees assessed, the Court finds Defendants' premise to lack merit.  Other courts have held the same, explaining that "[t]here is no indication that a loss of license will incentivize individuals to pay court fines and costs where those individuals simply cannot afford to pay."  *Stinnie*, 353 F. Supp. 3d at 531.  Actually, "[i]n practice, the loss of a driver's license adversely affects people's ability to gain and maintain employment, often resulting in a reduction of income. This deprives individuals of means to pay their court debt, hindering the fiscal interests of the government." *Id.* (internal citation omitted); *see also Tate v. Short*, 401 U.S. 395, 399 (1971) (finding that imprisoning those unable to pay traffic fines "is imposed to augment the State's revenues but obviously does not serv that purpose").

On balance, Plaintiffs' private interest is great, particularly so when viewed in comparison to the government's unsubstantiated interest, and there is a risk of erroneous deprivation given the lack of any pre-deprivation procedure.

*     *     *

Altogether, the Court finds that Plaintiffs have shown a viable likelihood of success on the merits as to their procedural due process claim.

### B. Irreparable Harm

The Court now turns to the next preliminary injunction factor.  To establish irreparable harm, a plaintiff must show that its injury is "great, actual, and imminent."  *Hi–Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (JDB). Plaintiff must also "demonstrate irreparable injury is likely in the absence of an injunction."  *Winter*, 129 S.Ct. at 375.  The law of this Circuit is clear that economic loss, in and of itself, does not constitute

irreparable harm. *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). "[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Therefore, there is a "'presumed availability of federal equitable relief against threatened invasions of constitutional interests.'" *David v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).

To begin, the Court notes that Defendants have conceded this argument by failing to respond to it whatsoever in its opposition papers. *See Phrasavang*, 656 F. Supp. 2d at 201; Order at 4–5, ECF No. 3. The Court nevertheless proceeds with a brief discussion.

The Court finds that Plaintiffs have shown two categories of irreparable harm. First, as noted above, Plaintiffs have demonstrated a likelihood of success on the merits as to their procedural due process claim. Therefore, under the law of this Circuit, such a constitutional violation constitutes irreparable injury. *See David*, 158 F.3d at 1346; *Mills*, 571 F.3d at 1312; Pls.' Reply at 22–23.

Second, Plaintiffs have shown ongoing harm as it relates to their day-to-day lives. Specifically, "Plaintiffs have trouble finding and keeping work, buying groceries, accessing medical care, caring for children and aging parents." Pls.' Mot. at 39. For some, walking—as is frequently required without a driver's license—exacerbates medical problems. *Id.* at 39–40. The D.C. City Council has recognized the Clean Hands Law's deleterious effects, "repeatedly invok[ing] the harms the [law] inflicts on District residents of limited means as the justification for the legislation" repealing it. Pls.' Mot. at 21. One Councilmember specifically "noted that it is remarkable how broad and far-reaching the consequences of not being able to pay one's traffic tickets impact a resident's life, health, and livelihood." Pls.' Mot. Ex. B at 8 (summarizing

statements of Councilmember Brooke Pinto).  These injuries are ongoing and will continue to occur absent this Court enjoining the Clean Hands Law such that Plaintiffs can apply for driver's licenses again.

The Court also notes that although the Clean Hands Law will be repealed in October 2023, that does not rebut Plaintiff's irreparable harm nor obviate the need for injunctive relief now.  *Cf. U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (finding injunctive relief may still be necessary even after "discontinuance of the illegal conduct").

Altogether, the Court finds that Plaintiffs have shown, and Defendants conceded, irreparable harm absent injunctive relief.

### C. Balance of Equities and the Public Interest

"The final two factors the Court must consider when deciding whether to grant a [temporary restraining order] are the balance of harms and the public interest." *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013) (KBJ).  Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F. Supp. 2d at 41.  Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

The Court again notes that Defendants have conceded this argument by failing to respond to it in its opposition papers. *See Phrasavang*, 656 F. Supp. 2d at 201; Order at 4–5, ECF No. 3.

Plaintiffs have established a likelihood that they will prevail on the merits of their due process claim, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (EGS) (internal quotation marks omitted).  There is no harm to the Government when a court prevents unlawful practices. *See Gordon v. Holder*, 826 F. Supp. 2d 279, 297 (D.D.C. 2011) (RCL), *aff'd*, 721 F.3d 638 (D.C. Cir. 2013).

Additionally, granting injunctive relief is in the public interest because the Clean Hands Law "exacts broad[] societal costs," imposing challenges in the lives of predominantly marginalized D.C. residents.  Pls.' Mot. at 43.  The D.C. Council's Office of Racial Equity stated that the "current inclusion of driver's licenses in the District's Clean Hands policy disproportionately impacts Black residents' overall qualify of life," exacerbating racial disparities.  Pls.' Mot. Ex. B at 117.  Plaintiffs note additional costs exacted by the Clean Hands Law, including impairing the District's economic growth.  *See* Pls.' Mot. at 43.  On the flipside, as the District itself has recognized, the law does not benefit public safety, *see id.* at 44 (citing D.C. Committee of the Whole, *Thirtieth Additional Legislative Session*, at 30:08 (May 24, 2022) http://dc.granicus.com/MediaPlayer.php?view_id=3&clip_id=7480), nor is it effective in generating revenue for the city, *Best Practice Guide to Reducing Suspended Drivers*, Am. Ass'n of Motor Vehicle Adm'rs, at 6 (2013), https://www.justice4all.org/wpcontent/uploads/2015/02/SuspendedRevokedBestPracticeGuide.pdf; *see also* Pls.' Mot. at 22–25.

As explained above, and keeping in mind Defendants conceded this argument, the Court finds that the balance of the equities and the public interest weigh in favor of granting injunctive relief.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiffs' [4] Motion for Preliminary Injunction is

GRANTED.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge